**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
SCRANTON DIVISION**

| | | |
|---|---|---|
| **JAMES EVERETT SHELTON, CHRISTIAN TORRES, and M&P REAL ESTATE INVESTORS LLC, a New Jersey limited liability company,** individually and on behalf of all others similarly situated,<br><br>　　　　Plaintiffs<br>　　v.<br><br>**EMERALD LAKES ASSOCIATION, INC.**<br><br>　　Defendant | : : : : : : : : : : : : : : : : : : : : | CIVIL ACTION – LAW<br><br>**No. _____**<br><br><br><br>JURY TRIAL DEMANDED |

**<u>CLASS ACTION COMPLAINT</u>**

Plaintiffs James Everett Shelton ("Mr. Shelton"), Christian Torres ("Mr. Torres"), and

M&P Real Estate Investors LLC, a New Jersey limited liability company ("M&P"), individually

and on behalf of all others similarly situated, by and through their undersigned counsel, bring

this Class Action Complaint against Defendant Emerald Lakes Association, Inc. (the

"Association" or "Defendant"), and in support thereof aver as follows:

**<u>PRELIMINARY STATEMENT</u>**

1.　　This is a class action challenging an unauthorized and unlawful program of fees,

charges, and fines imposed by the Association upon owners who rent their homes in the Emerald

Lakes planned community located in both Tunkhannock Township and Tobyhanna Township,

Monroe County, Pennsylvania (collectively, the "Rental Fee Program").

2.　　The Association is a Pennsylvania planned community governed by a recorded

Declaration of Covenants, Restrictions and Limitations (the "Declaration"), the Association's

1

By-Laws (the "By-Laws"), and the Association's Community Rules, Regulations and Building Procedures (the "Rules and Regulations").

3.      The Declaration is the controlling instrument for the Emerald Lakes community. It contains no rental restriction. To the contrary, the Declaration affirmatively contemplates and authorizes rentals, expressly recognizing that "lessees of lot owners" are part of the community's membership scheme.

4.      The Declaration's only use limitation is that the premises "shall be used for residential purposes only." A renter who sleeps, eats, bathes, and otherwise resides in the home uses it for residential purposes, and the Declaration makes no distinction between short-term and long-term rentals. *Ruffed Grouse Ridge Owners' Ass'n v. Hura*, 317 A.3d 665 (Pa. Cmwlth. 2024). Separately, the Declaration provides that no building other than "one detached single-family dwelling" may be erected on a lot. That single-family language appears only in the Declaration's building restriction, which governs what may be constructed, not how a home may be occupied. *Chan v. Ass'n of Prop. Owners of The Hideout, Inc.*, 323 A.3d 92 (Pa. Cmwlth. 2024). Renting is therefore a permitted residential use.

5.      Notwithstanding the absence of any authority in the Declaration, and without ever amending the Declaration or validly amending the By-Laws, the Association has imposed and continues to impose upon renting owners a Rental Fee Program consisting of tiered "rental plan" fees of up to $2,500 per year, an annual rental registration fee of $250, and a schedule of rental-related fines.

6.      The Rental Fee Program is *ultra vires*, was adopted without authority, conflicts with the controlling Declaration, and is void and unenforceable as a matter of Pennsylvania law.

2

7.     The controlling authority is squarely on point. In *Chan v. Ass'n of Prop. Owners of The Hideout, Inc.*, 323 A.3d 92 (Pa. Commw. Ct. 2024), *appeal denied*, 463 MAL 2024 (Pa. Feb. 12, 2025), the Commonwealth Court held void and unenforceable a materially identical scheme of rental restrictions and fees imposed by a Pennsylvania planned community whose declaration likewise authorized rentals and contained only a single-family-dwelling provision.

8.     And, in *Ruffed Grouse Ridge Owners' Ass'n v. Hura*, 317 A.3d 665 (Pa. Commw. Ct. 2024), the Commonwealth Court held that a short-term rental, such as an AirBnB or VRBO, is a permitted "residential" use that an association may not bar or burden where its governing documents do not plainly so provide.

9.     Plaintiffs' position here is even stronger than in *Chan*. In *Chan*, the association attempted a By-Law amendment submitted to a vote of the membership. Here, no amendment of the Declaration and no valid amendment of the By-Laws authorizing the Rental Fee Program ever occurred at Emerald Lakes. The Rental Fee Program rests on nothing more than unilateral Board action and an unauthorized delegation of fee-setting power to management.

10.    Plaintiffs bring this action on behalf of themselves and all similarly situated owners for: (i) a declaratory judgment that the Rental Fee Program is void and unenforceable; (ii) a permanent injunction barring its enforcement; (iii) damages, including treble damages, attorneys' fees, and costs, under the Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 P.S. §§ 201-1 et seq. (the "UTPCPL"); and (iv) restitution of all rental fees, charges, and fines collected under the Rental Fee Program during the applicable limitations period, together with interest, attorneys' fees, and costs, under the Uniform Planned Community Act, 68 Pa.C.S. § 5412.

**JURISDICTION AND VENUE**

3

11. This Court has original subject-matter jurisdiction over this action under the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. § 1332(d)(2), because this is a class action in which the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs; the proposed class consists of at least 100 members; and at least one member of the proposed class is a citizen of a State different from the Defendant.

12. The amount in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs. The Association's own budgets project the following revenue from the Rental Fee Program alone (denominated "Total Rental" revenue) over the six fiscal years preceding the filing of this Complaint:

| Fiscal Year | Rental Fee Program Revenue |
|---|---|
| 2021–2022 | $485,000 |
| 2022–2023 | $606,600 |
| 2023–2024 | $703,000 |
| 2024–2025 | $743,500 |
| 2025–2026 | $834,500 |
| 2026–2027 | $863,000 |
| **Six-Year Total** | **$4,235,600** |

13. As reflected in the Association's own budgets, the Rental Fee Program generated, and was projected to generate, no less than $4,235,600 in revenue over the six fiscal years preceding the filing of this Complaint, and the program's revenue has escalated each year, rising from $485,000 in fiscal year 2021–2022 to $863,000 in fiscal year 2026–2027. This is to say nothing of the additional revenue brought about by the unlawful fines imposed by the Association for purported "violations" of the Rental Fee Program. The Rental Fee Program remains in effect, and the Association continues to impose and collect its fees, charges, and fines, so that the amounts at issue continue to accrue through the date of trial.

14. The amount in controversy exceeds $5,000,000 independent of any trebling under the UTPCPL. First, the restitution and disgorgement recoverable on behalf of the UPCA

4

Restitution Class for the Rental Fee Program fees, charges, and fines collected during the four-year period preceding the filing of this Complaint is no less than approximately $3,100,000, recoverable under 68 Pa.C.S. § 5412 without regard to the UTPCPL. Second, the amount in controversy further includes reasonable attorneys' fees and costs recoverable under the UPCA and pre-judgment interest. Third, the Association has recovered, upon information and belief, and to be further identified through discovery, hundreds of thousands of dollars' worth of additional funds through "fines" imposed under the unlawful Rental Fee Program. Finally, the value of the permanent injunctive relief sought by the Injunctive/Declaratory Class adds substantial further value to the amount in controversy because the Rental Fee Program is a recurring annual charge that the requested injunction would prevent each year going forward.

15. Taken together, and exclusive of any UTPCPL trebling, these components place well more than $5,000,000 in controversy.

16. The amount placed in controversy is further increased beyond the independently sufficient amounts set forth above, because Plaintiffs and the UTPCPL Class seek damages and treble damages under the UTPCPL, 73 P.S. § 201-9.2, which authorizes recovery of the actual damages sustained, and up to treble that amount. A collection of any of the amounts collected under the Rental Fee Program over the applicable period would increase the amount in controversy several times over. Plaintiffs and the Classes also seek an award of reasonable attorneys' fees and costs under both the UTPCPL and the UPCA, each of which further increases the amount in controversy.

17. The proposed Classes consist of well more than 100 members. Upon information and belief, the Association currently administers approximately 297 short-term rentals within the community, and approximately 125 long-term rentals, and therefore the number of owners who

have paid fees, charges, or fines under the Rental Fee Program during the applicable limitations periods numbers in the hundreds.

18.     Minimal diversity exists under 28 U.S.C. § 1332(d)(2)(A). Plaintiff Mr. Shelton is a citizen of Pennsylvania. Plaintiff Christian Torres is a citizen of the State of Florida. Plaintiff M&P Real Estate Investors LLC is a New Jersey limited liability company with its principal place of business in New Jersey. Upon information and belief, a substantial number of the members of the proposed Classes, upon information and belief, approximately 77%, are citizens of States other than Pennsylvania, including, among others, Florida, New Jersey, and New York, and at least one member of the proposed Classes is a citizen of a State different from the Defendant.

19.     The Defendant Emerald Lakes Association, Inc. is, for diversity purposes, a citizen of Pennsylvania, where it is incorporated and maintains its principal place of business.

20.     No mandatory exception to CAFA jurisdiction applies, and neither the home-state exception nor the local-controversy exception of 28 U.S.C. § 1332(d)(4) defeats jurisdiction here.

21.     This Court has personal jurisdiction over the Association because the Association is incorporated under the laws of the Commonwealth of Pennsylvania, maintains its principal place of business and registered office within this District, and conducts continuous and systematic business within this District.

22.     Venue is proper in the Middle District of Pennsylvania under 28 U.S.C. § 1391(b)(2) because the real properties giving rise to the claims are located in this District.

### THE PARTIES

23.     Plaintiff James Everett Shelton ("Mr. Shelton") is an adult individual and a citizen of the Commonwealth of Pennsylvania.

6

24.    Plaintiff Christian Torres ("Mr. Torres") is an adult individual and a citizen of the State of Florida.

25.    Plaintiff M&P Real Estate Investors LLC ("M&P") is a New Jersey limited liability company with its principal office located in New Jersey.

### Defendant Emerald Lakes Association, Inc.

26.    Defendant Emerald Lakes Association, Inc. is a Pennsylvania corporation with its principal place of business and registered office located at 1112 Glade Drive, Long Pond, Pennsylvania 18334. The Association is the entity charged with the administration and governance of the Emerald Lakes planned community and is the owner of the common areas, lakes, recreational facilities, and roads within Emerald Lakes.

### FACTUAL ALLEGATIONS

### OVERVIEW OF CONTROLLING LAW

Under *Chan v. The Hideout*, Use Restrictions Must Be Contained in Covenants

27.    In *Chan*, the Commonwealth Court addressed a Pennsylvania planned community whose declaration expressly authorized rentals and contained only a single-family-dwelling provision, and whose board sought to limit short-term rentals and to impose enrollment requirements and annual fees on renting owners.

28.    The Commonwealth Court held the rental restriction void and unenforceable. A covenant addressing only the type of building permitted is a building restriction, not a use restriction. Building restrictions and use restrictions are "wholly independent of one another," and neither is to be "extended so as to include the other unless the intention to do so is expressly and plainly stated." *Schulman v. Serrill*, 246 A.2d 643, 646 (Pa. 1968) (quoting *Jones v. Park Lane for Convalescents*, 120 A.2d 535, 538 (Pa. 1956)). Any restriction on use must therefore be plainly expressed, not left to implication. *Kauffman v. Dishler*, 110 A.2d 389, 391 (Pa. 1955).

7

29.     Because the Hideout's declaration did not authorize the regulation of rentals, and because a declaration prevails over conflicting by-laws under 68 Pa.C.S. § 5203(c), the *Chan* Court held the by-law amendment void and unenforceable. The Rental Fee Program here suffers the same defect. It also violates the Association's own By-Laws, which require the Board to assess common expenses against Members "in such fair and equitable proportions and amounts" (By-Laws, Art. V, § 1(b)), and permit only member-approved dues, member-approved special assessments, and cost-based service charges (By-Laws, Art. X, §§ 1, 3–5). The Rental Fee Program is none of these: it is a non-uniform charge imposed on only the subset of owners who rent.

30.     Emerald Lakes is materially indistinguishable from *Chan*. As will be explained below, the Emerald Lakes Declaration not only lacks any rental restriction; it expressly recognizes "lessees of lot owners" as part of the community membership scheme. There is no reading of the Declaration that authorizes the Board to condition rental upon payment of annual fees, tiered rental plan charges, or fines.

*Ruffed Grouse Ridge v. Hura* Confirms That Renting Is a Permitted Residential Use

31.     In *Ruffed Grouse*, the Commonwealth Court affirmed summary judgment for an owner who rented his home on a short-term basis, and held that short-term rental is a permitted "residential" use.

32.     The *Hura* Court held that a covenant limiting use to residential purposes does not restrict the property to owner-occupied use, does not prohibit rental, and makes no distinction between short-term and long-term rentals. The proper focus is on how the occupants physically use the property: that is, whether the renters use the property for ordinary household purposes, such as sleeping, bathing, and eating.

8

33.     The *Hura* Court applied the bedrock rule that restrictive covenants are strictly construed against persons seeking to enforce them and in favor of the free and unrestricted use of property, and that nothing short of a plain disregard of a restrictive covenant's express terms can create a violation.

34.     The covenant at issue in *Hura* was stricter than the Emerald Lakes Declaration. It barred commercial use outright and limited use "strictly to private residential purposes only." Even so, the Commonwealth Court held that short-term rentals did not violate that covenant.

35.     The Emerald Lakes Declaration limits use to "residential purposes only," and its "single-family dwelling" language appears only in the building restriction. The Association therefore cannot treat renting as a prohibited or commercial use, cannot treat short-term rentals differently from long-term rentals, and cannot impose fees or fines on the theory that renting requires special authorization.

<u>Board- and Management-Promulgated Rules That Conflict With, or Are Not Authorized by, the Declaration and By-Laws Are Void and Unenforceable Under Pennsylvania Law</u>

36.     Pennsylvania law establishes a clear hierarchy among an association's governing documents and subordinates all Board rulemaking to that hierarchy. Under the UPCA, the association's power to "[a]dopt and amend bylaws and rules and regulations" exists only "subject to the provisions of the declaration and the limitations of this subpart." 68 Pa.C.S. § 5302(a). That qualifier opens the entire enumeration of association powers, so every power the Board exercises, including rulemaking, is bounded by what the Declaration permits.

37.     The Board of Directors may not act to amend the Declaration. 68 Pa.C.S. § 5303(b). The Declaration thus sits at the apex of the governing document hierarchy, followed by the By-Laws, and then by Board-promulgated rules and regulations, which are subordinate to both.

38.    Where there is a conflict between the Declaration and the By-Laws or Rules, the Declaration prevails. 68 Pa.C.S. § 5203(c). *MetroClub Condo. Ass'n v. 201-59 N. Eighth St. Assocs., L.P.*, 47 A.3d 137, 153 n.8 (Pa. Super. 2012). The statutory grant of rulemaking authority is always bounded by the declaration's terms.

39.    Pennsylvania courts have accordingly held that board-enacted policies and rules that exceed the authority granted by the governing documents are void, regardless of whether the board acted in good faith.

40.    An even more demanding standard applies where, as here, board-enacted rules purport to restrict the inherent property rights of owners. *See Dawson v. Holiday Pocono Civic Ass'n, Inc.*, No. 12-1809, 2014 WL 10589056, at *5-*9 (Pa. Com. Pl. Jan. 21, 2014).

41.    Here, the Rental Fee Program is embodied in Board and management-promulgated Rules and Regulations and a "Rental Policy" that were never approved by a vote of the membership, that are not found in the By-Laws, and that the Declaration does not authorize. If a formally adopted by-law amendment is void where the Declaration does not authorize it, as *Chan* holds, then a mere Board-adopted rule, which ranks below a by-law, is even more plainly void.

42.    Because the Rental Fee Program exceeds the Board's authority under 68 Pa.C.S. § 5302(a), conflicts with the Declaration's authorization of rentals and uniform assessment scheme in violation of 68 Pa.C.S. § 5203(c), and purports to burden and restrict the owners' inherent right to rent without their consent, it is void, unenforceable, and illegal as a matter of Pennsylvania law.

**Plaintiffs' Ownership, Use, and Payments Under the Rental Fee Program**

Plaintiff James Everett Shelton

43.     Mr. Shelton is the owner of the property located at 159 White Tail Lane, Long Pond, Pennsylvania 18334 (the "White Tail Lane Property"), which is located within the Emerald Lakes planned community. By virtue of his ownership of the White Tail Lane Property, Mr. Shelton is a Member of the Association in good standing within the meaning of the Declaration and By-Laws.

44.     Mr. Shelton purchased the White Tail Lane Property as a vacation home and second home in August, 2023.

45.     Mr. Shelton stays at the White Tail Lane Property personally throughout the year for residential purposes, eating, sleeping, bathing, and otherwise residing there, and frequently brings his friends and family to enjoy and stay at the White Tail Lane Property.

46.     Mr. Shelton's purchase and use of the White Tail Lane Property is therefore primarily for personal, family, and household purposes within the meaning of the UTPCPL, 73 P.S. § 201-9.2.

47.     When Mr. Shelton is not personally using the White Tail Lane Property, he rents it to others on a short-term basis through platforms like AirBnB, and he often stays at the White Tail Lane Property himself when it is not rented.

48.     From 2023 through 2026, Mr. Shelton paid the "Unlimited" rental plan tier of $2,500 per fiscal year, together with the $250 annual rental registration fee, for a total of $2,750 in each such year, solely because he rented the White Tail Lane Property.

Plaintiff Christian Torres

49.     Mr. Torres is an owner of the property located at 134 Ash Drive, Long Pond, Pennsylvania 18334 (the "Ash Drive Property"), which is located within the Emerald Lakes planned community. By virtue of his ownership of the Ash Drive Property, Mr. Torres is a Member of the Association within the meaning of the Declaration and By-Laws.

11

50.     Mr. Torres purchased the Ash Drive Property in September 2023 as a vacation home and second home for his personal use.

51.     Mr. Torres stays at the Ash Drive Property personally throughout the year for residential purposes, including eating, sleeping, bathing, and otherwise residing there.

52.     Beginning in February 2024, Mr. Torres has also rented the Ash Drive Property to others on a short-term basis through platforms like AirBnB, and has been subjected to, and has paid, fees, charges, and fines assessed under the Association's Rental Fee Program.

53.     For the 2024 and 2025 rental years, Mr. Torres paid the "Unlimited" rental plan tier of $2,500 per fiscal year, together with the $250 annual rental registration fee, for a total of $2,750 in each such year, solely because he rented the Ash Drive Property.

54.     In addition, Mr. Torres has also been fined by the Association in connection with renting the Ash Drive Property as part of the unlawful Rental Fee Program.

55.     On or about March of 2024, the Association assessed fines against Mr. Torres for purportedly renting four times while "not in good standing", resulting in a $200 fine per rental, and for purportedly failing to register rentals or guests four times, resulting in an *additional* $200 fine per rental. The Association therefore demanded $1,600 from Mr. Torres for these fines. Collectively, these are referred to as the "First Batch of Fines".

56.     On or about July of 2024, the Association again assessed fines against Mr. Torres in the amount of $2,800 for purportedly renting his house fourteen times, resulting in a $200 fine per rental, because he purportedly had an unpaid balance on his Association account, deeming him "not in good standing" with the Association. Collectively, these are referred to as the "Second Batch of Fines".

57. The Association's own Rules and Regulations confer on Members a right to appeal a fine. Under the Appeals provision of the Rules and Regulations, a Member may appeal a fine within fifteen days and has the right to request a hearing before the Association's Appeals Committee.

58. Neither the March 2024 letter assessing the First Batch of Fines, nor the July 2024 letter assessing the Second Batch of Fines advised Mr. Torres that he could appeal the fines within fifteen (15) days, that he could request a hearing before the Appeals Committee, or that any appeal procedure existed at all. Nor did the Association provide Mr. Torres with any appeal form or instructions for invoking the appeal procedure when it delivered the fines. The letters instead demanded payment of the fines as fixed and owing.

59. The practical effect of the Association's practice is that Owners are coerced into paying these fines. A Member who receives a letter demanding payment of a fine, with no mention of any right to appeal and no appeal form enclosed, has no reason to know that an appeal procedure exists. Most Members do not undertake to research their rights or to locate and review the Rules and Regulations to discover the appeal right, and so believe they have no choice but to pay the fine the letter demands. The Association also makes invoking the appeal right as difficult as possible by conditioning any hearing on a Saturday morning appearance at the Association's offices.

60. The design and effect of this practice is to maximize the fine revenue the Association collects from Owners who pay rather than contest, consistent with the Association's treatment of rental registration fines as an additional recurring, projected line of revenue in its own budgets, as opposed to a method of securing compliance with the rules through fair enforcement.

13

61. Mr. Torres protested the fines to the Association's management.

62. The Association did not withdraw the fines or concede they were unauthorized.

63. Instead, the Association unilaterally reduced the fines as a matter of partial discretion while continuing to demand and require payment of the reduced amounts.

64. The Association reduced the First Batch of Fines issued March 2024 from $1,600 down to $580.

65. The Association reduced the Second Batch of Fines issued to Mr. Torres on July 2024 from $2,800 to $1,400.

66. Mr. Torres did not know he had the right to formally appeal these unlawful fines.

67. Even if Mr. Torres had been aware of his right to appeal the fines, he would have faced this same substantial burden for fines that are unlawful *ab initio*.

68. These cumulative practical barriers rendered appealing either of the fines unrealistic under the circumstances.

69. Mr. Torres paid the reduced fines of $1,400 and $580 to the Association. He did so in reliance on the Association's representation that the fines were valid, authorized, and required, and under the same coercive conditions applicable to all renting Owners, namely the threat of loss of good standing, revocation of amenity access, escalating fines, and suspension of the ability to rent.

70. At no time did Mr. Torres agree, stipulate, or acknowledge that the fines were valid or owed, or agree to compromise a disputed claim.

Plaintiff M&P Real Estate Investors LLC

71. M&P is the owner of the property located at 186 Sage Road, Long Pond, Pennsylvania 18334 (the "Sage Road Property"), which is located within the Emerald Lakes

planned community. By virtue of its ownership of the Sage Road Property, M&P is a Member of the Association in good standing within the meaning of the Declaration and By-Laws.

72.     From May 2023 through November 2025, M&P rented the Sage Road Property to others on a short-term basis through platforms like AirBnB, as well as its own website, and during that period, M&P was subjected to, and paid, fees and charges assessed under the Association's Rental Fee Program.

73.     For the rental years from May 2023 through April 2025, M&P selected and paid the "Unlimited" rental plan tier of $2,500 per year, together with the $250 annual rental registration fee, for a total of $2,750 in each such year, solely because it rented the Sage Road Property.

74.     For the rental year beginning May 2025, M&P paid the "39" rental plan tier of $2,000 per year, together with the $250 annual rental registration fee, for a total of $2,250, solely because it rented the Sage Road Property.

75.     In November 2025, M&P converted the Sage Road Property to a long-term rental. From November 2025 through the present and continuing, M&P has rented the Sage Road Property on a long-term basis and has been subjected to, and has paid, the $600 annual Long Term Rental Fee together with the $250 annual rental registration fee assessed under the Association's Rental Fee Program.

76.     M&P has thus paid charges under the Rental Fee Program as both a short-term renting Owner and, after November 2025, as a long-term renting Owner, and its claims for restitution under the UPCA are typical of the claims of both the short-term and long-term renting members of the UPCA Restitution Class.

**Pennsylvania Law, Applicable Covenants, and Emerald Lakes' Scheme**

15

The Uniform Planned Community Act

77.     Emerald Lakes is a "planned community" and the Association is its "association" within the meaning of Pennsylvania's Uniform Planned Community Act, 68 Pa.C.S. §§ 5101–5414 (the "UPCA").

78.     The UPCA defines a "declaration" as "[a]ny instrument, however denominated, that creates a planned community and any amendment to that instrument." 68 Pa.C.S. § 5103.

79.     Under 68 Pa.C.S. § 5302(a)(10), an association may impose and receive payments, fees, or charges for the use, rental, or operation of the common elements only "[s]ubject to the provisions of the declaration."

80.     The Uniform Planned Community Act enumerates the fees an association may impose in connection with units and their transfer, and authorizes no fee charged as the price of permission to rent a privately owned home. See 68 Pa.C.S. § 5302(a)(12). The Rental Fee Program is not a charge for the preparation or recording of amendments to the Declaration, not a resale certificate charge, and not a capital improvement fee on the resale or transfer of a unit. It finds no authorization in § 5302(a)(12) or in any other provision of the UPCA.

81.     Although the planned community was created in 1975, before the UPCA's effective date, the UPCA's enumerated provisions governing association powers and the validity of association action apply to the Association's conduct occurring after the UPCA's effective date. 68 Pa.C.S. § 5102(b), (b.1); *Burgoyne v. Pinecrest Cmty. Ass'n*, 924 A.2d 675, 681 (Pa. Super. 2007).

82.     The Rental Fee Program was imposed and enforced after the UPCA's effective date and is therefore governed by these provisions.

83.     Where there is a conflict between the declaration and the by-laws, the declaration controls. 68 Pa.C.S. § 5203(c).

16

The Controlling Declaration Permits Rentals and Contains No Rental Restriction

84.    The Declaration of Covenants, Restrictions and Limitations for Emerald Lakes was created by the developer, Unidel Corporation, trading as Emerald Lakes. It was recorded in the Office of the Recorder of Deeds in and for Monroe County, Pennsylvania, on June 4, 1975. The Declaration is an integral part of each Emerald Lakes property owner's deed, and is expressly made "an integral part of the By-Laws of Emerald Lakes Association, Inc."

85.    The Declaration is the equivalent of a contract between the members of the Association and the Association itself.

86.    The only use limitation contained in the Declaration provides that "[t]he premises to be conveyed shall be used for residential purposes only," and that "[n]o building shall be erected, altered, placed, or permitted to remain on the premises other than one detached single-family dwelling, not to exceed two stories in height, and a private garage for not more than two cars." Declaration, ¶ 1.

87.    Paragraph 9 of the Declaration restricts use of the lakes and recreational areas to "the members in good standing of the Emerald Lakes Association, Inc.," and expressly provides that "membership in the Association is limited to the purchasers of lots in this development and lessees of lot owners." Declaration, ¶ 9.

88.    The Declaration thus expressly recognizes "lessees of lot owners" as a class of community occupants, thereby affirmatively contemplating and authorizing the rental of homes within Emerald Lakes.

89.    The Declaration does not prohibit rentals, draw any distinction between short-term and long-term rentals, condition the right to rent upon payment of any fee, or authorize the Board to charge any fee or impose any fine as a condition of renting.

The By-Laws Permit Rentals and Confer No Authority to Impose Rental Fees

17

90.    The By-Laws reinforce that rentals are permitted.

91.    The By-Laws define an "Owner" to include "any lessee of a residential property under a recorded lease," and Article IV, Section 7 grants associate membership to "[p]ersons who may be tenants or regular occupants of residents of Members in good standing situated within Emerald Lakes."

92.    The By-Laws authorize only three categories of charges against owners: (i) annual dues and assessments, which under Article X, Section 3 may be adjusted or increased only "upon approval by a majority of the valid votes cast by the Voting Members present at any annual or special meeting of the Members"; (ii) special assessments for capital improvements or non-recurring expenditures, which under Article X, Section 4 likewise require approval by a majority of the Voting Members; and (iii) "other assessments," which under Article X, Section 5 "will include only those ordinary and necessary to the services applied to a property or Owner thereof." By-Laws, Article X.

93.    The By-Laws also strictly and exhaustively limit the Board's disciplinary and enforcement powers. Article XI, Section 2(b) enumerates the only disciplinary actions the Board may take for breach of any By-Law, rule, or regulation, and that enumeration consists solely of: (a) suspension of voting privileges; (b) suspension of "the Member's right to use any of the Community Facilities owned, operated, or managed by the Association for a period not to exceed thirty (30) days for each breach"; and (c) "a fine for each breach."

94.    The By-Laws confer no power whatsoever to suspend, restrict, or revoke an Owner's right to rent his or her property, and the only suspension power the By-Laws grant, suspension of Community Facilities access, is expressly capped at thirty (30) days per breach. By-Laws, Article XI, Section 2(b).

95.     The Rental Fee Program is none of the three authorized categories of charge. It is not a *uniform* annual dues assessment approved by the Voting Members (because it only imposes fees on those who rent their properties); it is not a special assessment approved by the Voting Members (because a short-term rental is neither a capital improvement nor a non-recurring expenditure); and it is not an "other assessment" that is "ordinary and necessary to the services applied to a property" within the meaning of Article X, Section 5.

96.     The Rental Fee Program charges bear no relationship to any actual service rendered to, or any actual cost incurred by the Association on account of, a renting Owner's property.

97.     The tiered structure of the fees, under which the annual charge rises with the number of times an Owner rents rather than with any measurable service or cost, confirms that the Rental Fee Program is a revenue-raising measure imposed on the subset of Owners who rent, not a recovery of costs "applied to a property or Owner thereof."

98.     A charge that rises with rental activity instead of with cost is not "ordinary and necessary to the services applied," and is therefore unauthorized even under Article X, Section 5.

99.     Nothing in the By-Laws authorizes the Board to impose fees or fines as a condition of renting a single-family residence, to create a tiered "rental plan" fee schedule, or to delegate the power to set such fees to the Association's management or staff.

100.    Any amendment of the By-Laws requires the affirmative vote of two-thirds of the valid votes cast by the Voting Members present at any annual or special meeting. By-Laws, Article XIV, Section 2.

101.    No such vote authorizing the Rental Fee Program was ever held.

102. Any amendment of the Declaration requires, at minimum, the vote or agreement of unit owners holding at least two-thirds (66.6666%) of the votes in the Association. 68 Pa.C.S. § 5219(a)(1).

103. No such vote or agreement authorizing the Rental Fee Program ever occurred.

104. No amendment to the Emerald Lakes Declaration concerning rentals has ever been adopted.

105. No amendment to the By-Laws concerning the Rental Fee Program has ever been adopted.

The Unauthorized Rental Fee Program

106. Despite the absence of any authority in the Declaration or the By-Laws, the Association has adopted and enforces the Rental Fee Program through the Rules and Regulations and through Board and management action.

107. The Rules and Regulations acknowledge that "[a]ssociation Members who own a residence in Emerald Lakes Community may rent, lease, or make available to others their residence," yet purport to require such Members to enroll in the Association's "Rental Policy," pay fees, and register each rental. *See* Rules and Regulations, Rentals.

108. The Association has published a bulletin entitled "Renting in Emerald Lakes" which is available online on the Enumerate Engage platform for all Members to view.

109. Under the Rental Fee Program, the amount an Owner must pay to rent depends on a tier the Owner is required to select.

110. The current tiers are: $2,500 per year for the "Unlimited" plan; $2,000 per year for the "39" plan (27 to 39 rentals); $1,400 per year for the "26" plan (up to 26 rentals); and $35

per rental for the "12" plan (12 or fewer rentals). Every renting Owner must also pay a separate $250 annual rental registration fee. The full schedule is set forth in the "Renting in Emerald Lakes" bulletin.

111. For an Owner on the highest tier, the result is a charge of $2,750 per year, the $2,500 plan fee plus the $250 registration fee, imposed solely because the Owner rents the home.

112. The Rental Fee Program is not limited to short-term rentals. The same "Renting in Emerald Lakes" bulletin imposes a separate fee regime on long-term rentals, which the Association defines as a rental period of more than thirty (30) days.

113. Under that regime, an Owner who rents on a long-term basis must pay the same $250 annual rental registration fee and, in addition, a separate $600 "Long Term Rental Fee" that the Association states is "required and payable on May 1st for access to all the Association's facilities and amenities."

114. The long-term Owner must also complete yearly registration, submit a Long-Term Registration Form, and provide a copy of the lease to the Association.

115. The $600 Long Term Rental Fee is charged expressly "for access to all the Association's facilities and amenities," yet the Declaration already grants that access. Paragraph 9 of the Declaration extends membership, and with it the use of the lakes and recreational areas, to "lessees of lot owners" (which would also include short-term renters).

116. The Association thus charges long-term renting Owners $600 per year for amenity access the Declaration already confers, without any authority in the Declaration or the By-Laws to impose such a charge.

117. Because the charge rises with the number of times an Owner rents, it operates as a fee *on renting itself*, not as a charge for any service the Association provides.

21

118.    Plaintiffs Shelton and Mr. Torres have paid the highest tier, $2,500 each year plus the $250 registration fee, simply to rent their own homes.

119.    Payment was mandatory, not optional. An Owner who does not pay is not permitted to rent.

120.    As a condition of being permitted to rent at all, the Association requires every renting Owner to execute its rental agreements, namely the "Landlord/Rental Property Registration" form and, for short-term rentals, the "Short-Term Rental Tier Selection" form, by which the Owner purports to "agree" to pay the Rental Fee Program charges.

121.    An Owner who declines to sign and pay is barred from renting, loses good standing, and is exposed to the escalating fines and penalties described below.

122.    The Rules and Regulations' Schedule of Fines further imposes rental-related fines upon owners, including, without limitation, a $200 per-offense fine for "Failure to Register Tenant," and a $200 per-offense fine for "Renting w/n [when not] in Good Standing." *See* Rules and Regulations, Schedule of Fines.

123.    The Association further requires renting Owners to register each guest with the Association at least twenty-four (24) hours before the guest's arrival, and fines an Owner $200 for registering guests on a last-minute basis more than three (3) times in a year.

124.    Plaintiffs object to being charged or fined for late registration when the inability to register in real time is a product of the Association's own administrative systems: guest information submitted through the Association's online resident portal (Enumerate Engage) does not transfer automatically to the separate platform its staff use to process registrations (Enumerate Central), forcing staff to re-enter the data manually.

125. The Association could readily eliminate this gap by integrating the two systems, but has not done so.

126. The 24-hour advance-registration requirement and its fine therefore penalize Owners for a delay of the Association's own making, a problem rooted in the Association's failure to integrate software systems, which are managed by staff whose salaries the Owners' dues already fund.

127. The requirement also prevents renting Owners from accepting legitimate last-minute bookings, which make up a meaningful share of reservations in the short-term rental market, and so directly reduces the rental income Owners are entitled to earn from the lawful use of their property.

128. The Association's "Renting in Emerald Lakes" bulletin sets forth a still more elaborate schedule of rental-specific fines and penalties, none of which is authorized by the Declaration or the By-Laws, including, without limitation: (i) "Renting while not in good standing," $200 per instance; (ii) "Unregistered Rental," escalating from $200 per rental for a first offense, to $300 per rental for a second offense, to $500 per rental for a third and subsequent offenses; (iii) "Illegal Rental Property" (a property rented without being registered), $500 per offense; and (iv) "Guest Pass Violations," escalating from $250 plus confiscation of passes for a first offense to $300 plus confiscation and possible suspension of privileges for a second offense. *See* "Renting in Emerald Lakes" bulletin.

129. Most egregiously, the "Renting in Emerald Lakes" bulletin purports to authorize the Association to suspend an Owner's right to rent. It provides that after a third offense of any rental fine, the Owner "will be designated as a Nuisance Rental Property and may be subject to suspension of rental privileges for 6 months," and that a Nuisance Rental Property designation

23

carries "possible suspension of rental privileges for 6 months, plus $1000 fine per occurrence." The Association thus claims the power to strip Owners of the right to rent their homes for six (6) months at a time and to fine them $1,000 per occurrence. *See* "Renting in Emerald Lakes" bulletin.

130.    The Association enforces the Rental Fee Program through the threat and imposition of a loss of good-standing status. Under Article III, paragraph 12 of the By-Laws, a Member is "In Good Standing" only if the Member is "current (or up to date) with payments to the Association for all assessments... together with such other costs, fees and expenses, if any, properly chargeable to the Member." *See* By-Laws, Article III, ¶ 12.

131.    Accordingly, when Members fail or refuse to pay the rental fees, charges, or fines, the Association treats them as "not in good standing."

132.    The consequence of being declared "not in good standing" is the loss of access to the community's amenities. Article IV, Section 3 of the By-Laws provides that "[e]ach Member in good standing shall be entitled to the use and enjoyment of the common properties and facilities", a privilege the By-Laws extend only to Members in good standing.

133.    The Rules and Regulations make the bar explicit: a Member "who has been declared 'not in good standing of the Association'... [s]hall be barred from exercising his/her privileges of Membership," and that barring "applies to the Member directly as well as all other Members, Associate Members, Family Members, Renters, and Guests associated with said property." *See* Rules and Regulations, General, ¶ 5(a); *see also* By-Laws, Article IV, Section 3.

134.    The Rules and Regulations separately bar a not-in-good-standing Owner's household from the Association's Community Center and indoor pool complex, providing that

24

persons in a household in which the owner is "not in good standing will not be permitted to use the Center." *See* Rules and Regulations, Community Center, ¶ 3.

135.    The loss of good standing also strips a Member of core governance rights. Under the By-Laws, only "Members in good standing may vote on all matters at membership meetings," By-Laws, Article IV, Section 7, and nomination for or service on the Board of Directors is "limited to one (1) record owner of a lot... who shall be a member in good standing of the Association," *See* By-Laws, Article VI, Section 3(d).

136.    By conditioning these membership, amenity, voting, and candidacy rights on payment of the unauthorized Rental Fee Program charges, the Association coerces Owners into paying fees, charges, and fines it has no authority to impose.

137.    On information and belief, the Board did not itself fix the amounts of the Rental Fee Program charges by any duly authorized assessment approved by the Voting Members; instead, the Board purported to delegate to the Association's management the authority to set and collect these rental fees, a delegation for which there is no authority in the Declaration or By-Laws.

138.    Upon information and belief, a rental fee program has been in place at Emerald Lakes since as early as 2014.

139.    Upon information and belief, the Association currently has approximately 297 short-term rentals within the community and approximately 125 long-term rentals.

140.    The effect of the Rental Fee Program is to require renting Owners to subsidize a disproportionate share of the community's operating revenue. Renting Owners pay the same annual dues as every other Owner, currently $1,280 for an improved lot and $1,080 for an

unimproved lot, and are then required to pay the Rental Fee Program charges on top of those dues, solely because they rent.

141.    The Rental Fee Program charges are not tied to any actual expense the Association incurs on account of a rental; they are arbitrary amounts fixed by the Board and management.

142.    The lawful means of raising additional revenue to meet the community's operating expenses is to increase the annual dues by a vote of the membership, as Article X, Section 3 of the By-Laws requires, so that the cost of operating the community is spread fairly and equitably across all property Owners.

143.    Rather than pursue that authorized course, the Association elected to raise revenue by imposing escalating, unauthorized charges on the subset of Owners who rent, charges that were never lawful and that the Association sought to increase by as much as $950 for the top tier in March 2026.

144.    Because the Rental Fee Program is unauthorized by the Declaration and the By-Laws and is void and unenforceable as set forth herein, all of the rental registration fees, short-term rental registration fees, rental registration late fees, rental registration fines, and related charges that the Association has collected, and continues to collect, under the Rental Fee Program were and are collected without lawful authority.

<u>The Association's Management Admits it Unilaterally Controls Rental Fee Prices</u>

145.    On June 27, 2024, the Association's management distributed to Owners, by email with the subject header "IMPORTANT MESSAGE FROM THE GENERAL MANAGER!", a letter from the Association's General Manager, Darryl Gamble, addressed to all Landlords in the Association regarding the Short-Term Rental Program. The letter read, in pertinent part:

"*The Board has no say or power over the program. The Short-Term Rental Program is solely managed internally with suggestions from the Board and the Real Estate Committee.*"

146. On March 24, 2026, the Association's management distributed to Owners, by email, a "Rental Policy & Tier" document (bearing a printed date of April 1, 2026) by which it unilaterally attempted to raise the highest rental plan tier by $900, from $2,500 to $3,400 per year.

147. That same day, Emerald Lakes' management also unilaterally attempted to raise the annual rental registration fee from $250 to $300.

148. When Plaintiff Mr. Shelton and many other owners immediately complained, the Association backed down from the attempted fee increases, totaling as much as $950, just three days later.

149. In a March 27, 2026 email, the Association confirmed that "[s]hort-term rentals continue to be a permitted and valued use within the community and remain an important component of Emerald Lakes," and stated that it would "process any refunds that may be due to those who have already submitted their payment in full" for the discontinued tier.

150. The Association nonetheless continues to charge $2,500 for the top tier, plus the $250 annual rental registration fee.

151. The March 24, 2026 attempted increase, and the Association's retreat from it only after owner complaints a mere three days later, confirm that the Association and its management set the Rental Fee Program amounts on their own, with no membership vote and no authority in the governing documents. In the span of seventy-two hours, the Association purported to unilaterally raise the top rental plan tier and registration fee by as much as $950 and then rescinded that increase, each time by management email alone and without any amendment of the Declaration or By-Laws, without any vote of the membership, and without identifying any

27

provision of the governing documents authorizing either the original charges or their attempted increase.

152.    That the Association treats the fee amounts as freely adjustable at management's discretion shows they have no basis in the governing documents or any statute.

153.    A charge the Association's management (or its Board) can raise or lower at its discretion overnight is not a real assessment tied to the community's expenses. It is a fee that management (or in the alternative, the Board) sets however it likes.

The Association Was Advised of the *Chan v. The Hideout* Ruling and Refused to Act

154.    After the decision in *Chan v. The Hideout* was published, and upon information and belief, a former member of the Association's Board, Michael Camino, advised the Emerald Lakes Board of Directors of the *Hideout* decision and provided all Board members with copies of that decision in an Executive Session held on January 25, 2025, as well as an article published online by the attorney representing the property owners in the *Hideout* matter.

155.    Upon information and belief, the Association's president of the Board of Directors, Maria Quinones, refused to recognize the *Hideout* decision, claiming that she had spoken with the Association's legal counsel, and that counsel had advised that the Board remained legally permitted to charge the rental fees.

156.    At no point did the Association ever advise Owners that the Rental Fee Program was or might be unlawful, unauthorized, or contrary to the Declaration, the By-Laws, or controlling Pennsylvania law, including the *Hideout* decision. To the contrary, the Association at all times represented to Owners, through the mandatory rental agreements, the Rules and Regulations, the "Renting in Emerald Lakes" bulletin, and its course of enforcement, that the Rental Fee Program was a valid and legally enforceable obligation that Owners were required to pay as a condition of renting, and it compelled Owners to pay accordingly.

28

157. Even after the unlawfulness of the Rental Fee Program was repeatedly brought directly to the Association's attention, including by reference to the *Hideout* decision, the Association refused to admit that the program was illegal, refused to rescind it, and continued to represent that it was lawful and to demand and collect payment.

158. Even before the *Hideout* decision was rendered, the Association had an obligation to examine its own Declaration and By-Laws and to verify whether the Rental Fee Program was authorized by those governing documents. The Association failed to do so.

159. Had the Association undertaken that review, it would have confirmed, as the Declaration and By-Laws plainly reflect, that the Rental Fee Program was never authorized.

Plaintiff Shelton Attempts to Ascertain the Purported Legal Basis for Rental Fees

160. Prior to filing the instant lawsuit, Mr. Shelton requested to meet with the Board on Saturday, May 30, 2026 to discuss this issue. By email on Tuesday, May 26, 2026, the Board agreed to meet.

161. Prior to the May 30 meeting, the Board specifically requested an agenda from Mr. Shelton for the meeting.

162. Mr. Shelton provided it via email on May 27th, with the very first item being: "Discuss the legality and basis for the current STR fees."

163. Prior to the meeting, the Board did not raise any objections to this agenda item.

164. When Mr. Shelton arrived at the meeting, which was recorded on video, the Board stonewalled Mr. Shelton completely and refused to discuss the legality or any basis for the fees.

165. No attorney representing the Association was present at the meeting.

29

166.    Instead, the Board dismissively declared "we aren't here to discuss legalities", despite knowing in advance this very topic was the entire purpose of said meeting.

167.    The Board did agree to another meeting with Mr. Shelton on June 27, 2026, to give the Board the opportunity to discuss the matter internally and to consult with counsel in the meantime.

Plaintiff Shelton's Demand and the Association's Refusal to Cease

168.    On June 15, 2026, Mr. Shelton wrote to the Board via email to make his position clear for the upcoming meeting that the current Fee Program was illegal, unauthorized, and unenforceable.

169.    Mr. Shelton demanded that the Board immediately agree in writing to permanently rescind the entire illegal Fee Program going forward.

170.    Despite this demand, the Association has refused to rescind the Rental Fee Program. By email sent on June 17, 2026, the Association's attorney wrote to Mr. Shelton advising that the Association had decided to cancel the proposed June 27, 2026 follow-up meeting.

171.    At no time did the Association or its attorney ever provide any explanation, justification, or defense to the purported legality of the Fee Program, to Mr. Shelton or anyone else.

172.    The Association continues to charge and collect the rental fees and registration fee and will not back down. The Association continues to charge $2,500 for the top rental plan tier plus the $250 annual rental registration fee, and continues to threaten and impose rental-related fines.

173.    As a direct and proximate result of the Association's unauthorized Rental Fee Program, Plaintiffs and the members of the Classes have paid, and continue to pay, fees, charges, and fines that the Association had no authority to impose, and have suffered ascertainable monetary loss.

The Rental-Suspension Penalties Are Void on the Face of the By-Laws, Independent of the Declaration

174.    Wholly apart from the Declaration, the Rental Fee Program's enforcement penalties are void on the face of the By-Laws. Article XI, Section 2(b) of the By-Laws exhaustively enumerates the disciplinary actions the Board is empowered to take for breach of any By-Law, rule, or regulation: suspension of voting privileges; suspension of the right to use the Community Facilities "for a period not to exceed thirty (30) days for each breach"; and a fine for each breach. That enumeration is the entire universe of the Board's disciplinary power.

175.    The "Renting in Emerald Lakes" bulletin exceeds that authority.

176.    *First*, the By-Laws grant the Board no power of any kind to suspend an Owner's right to rent; yet the bulletin purports to authorize suspension of "rental privileges for 6 months."

177.    *Second*, even as to the one suspension power the By-Laws do grant, suspension of Community Facilities access, that power is expressly capped at thirty days per breach; yet the bulletin purports to impose suspensions of six months.

178.    A six-month suspension of rental rights is therefore *ultra vires* on two independent grounds: it is a category of penalty the By-Laws never authorize, and it is six times longer than the maximum suspension the By-Laws permit for anything.

179.    The associated "Nuisance Rental Property" designation and $1,000-per-occurrence fines are void for the same reason.

180. This ground requires no resort to the Declaration at all. Because the Board may exercise only those disciplinary powers expressly set forth in the governing documents, and Article XI, Section 2(b) neither authorizes the suspension of rental rights nor permits any suspension exceeding thirty days, the rental-suspension and Nuisance Rental Property penalties are void and unenforceable as a matter of law.

181. The threatened loss of the right to rent for six months, unlike the refundable fees, inflicts immediate and irreparable harm that cannot be adequately remedied by money damages, and supports the entry of preliminary and permanent injunctive relief.

The Rental Fee Program Is an Unauthorized *De Facto* Restriction on the Declaration-Guaranteed Right to Rent

182. Because the Declaration affirmatively authorizes rentals and the right to rent one's home is an inherent incident of ownership, the Association may not attempt to do indirectly, through fees, charges, and penalties, what it cannot do directly: restrict or condition the right to rent. A charge heavy enough to burden, deter, or penalize the exercise of a vested right operates as a *de facto* restriction on that right, and is invalid for the same reason an express restriction would be, because the governing documents confer no authority to impose it.

183. The Rental Fee Program is precisely such a restriction. The Association extracts a $2,750 annual charge, more than double the $1,280 annual assessment paid by every Owner, solely as the price of renting; it fines Owners who rent without first paying; and it purports to suspend the right to rent outright for six months and to brand a home a "Nuisance Rental Property."

184. These are not neutral "fees" for services. They are financial barriers and penalties attached to the exercise of a right the Declaration guarantees. Their practical effect is to deter and burden renting, and the escalating-penalty structure makes plain that this is their purpose as well.

185.    Pennsylvania law forecloses this maneuver. The right to lease real estate is an inherent incident of ownership that a property owners' association cannot prohibit absent the consent of the affected owners. *Dawson*, 2014 WL 10589056, at \*5-\*9. An association cannot evade that rule by leaving the right nominally intact while taxing and penalizing its exercise.

186.    The Uniform Planned Community Act authorizes fines only for violations of the declaration, by-laws, or rules, not for the exercise of a right the Declaration expressly grants. 68 Pa.C.S. § 5302(a)(11). A fine imposed as the price of renting therefore exceeds the Association's statutory authority and is void.

187.    Even under the UPCA's general fee framework, an association may impose fees only for the use, rental, or operation of the common elements, and not for the rental of a privately owned home.

<ins>The Rental Agreements the Association Compelled Owners to Sign Are Void and Do Not Bar Relief</ins>

188.    Plaintiff and the Classes are not bound by the rental agreements they signed and the payments they made. The agreements are void, unenforceable, and incapable of ratification, on multiple independent grounds, and neither the signatures nor years of compelled payment bar declaratory relief, statutory damages, or restitution.

189.    First, the agreements are void *ab initio* because the underlying obligation is *ultra vires.* Any agreement to pay into the Rental Fee Program is just a written record of an obligation the Association had no authority to impose in the first place.

190.    A void contract is one that offends against public law or policy or is without the scope of proper authority. Where the underlying fee program is void *ab initio*, because it conflicts with the Declaration, violates the UPCA, and was imposed without authority, an agreement to pay those fees is equally void.

33

191. The Association cannot launder an illegal fee program into an enforceable obligation simply by requiring Owners to sign a piece of paper agreeing to pay it, since Pennsylvania courts will not enforce agreements premised on *ultra vires* acts.

192. Second, the agreements fail for want of consideration. A binding contract requires that something of value pass to the promisor.

193. Here, Plaintiffs and the putative Class Members received nothing they did not already possess. Their right to rent was already vested in them by the Declaration. An Owner who signs a "rental agreement" obtains no new right, benefit, or promise, only the dubious "privilege" of paying an unauthorized fee to exercise a right the Declaration already guarantees.

194. Third, the agreements were procured by economic duress.

195. Both elements of economic duress under Pennsylvania law are present. The Association extracted each signature under threat of immediate and severe consequences, including loss of the ability to rent, loss of good standing, revocation of amenity access, escalating fines, and disenfranchisement, all while no adequate or immediate legal remedy was available to the Plaintiffs to prevent enforcement in the interim. And the coercion is plain, since the Association made an Owner give up vested property rights, including amenity access, voting, candidacy, and the right to rent, if they did not sign and pay the fees.

196. The pressure of circumstances was entirely of the Association's own making, and not the result of the Owners' own actions.

197. Fourth, neither years of payment nor the absence of contemporaneous protest constitutes waiver, ratification, or a voluntary payment barring restitution. Waiver requires a clear, unequivocal, and decisive act, made with knowledge of the right and an evident purpose to

34

surrender it; a mere inference of relinquishment is legally insufficient, and payment compelled as a precondition to exercising a vested right is not voluntary.

198. A void, *ultra vires* act cannot be ratified by either party, because neither could have authorized it in the first place.

199. Fifth, the voluntary payment doctrine does not apply and does not bar restitution here, since money paid under a claim of right cannot be recovered unless the payment was compelled.

200. That requirement is satisfied here because payment of the Rental Fee Program charges was a non-negotiable precondition to exercising the Declaration-guaranteed right to rent at all.

201. Plaintiffs and the putative Class Members faced immediate and escalating coercion, including loss of good standing, revocation of amenity access (including the community center and pool for the entire household), disenfranchisement of voting and Board candidacy rights, fines up to $1,000 per occurrence, and threatened six-month suspension of rental privileges.

202. Sixth, even setting aside duress, the agreements cannot operate as a waiver of the Plaintiffs' statutory and Declaration-based rights. The UPCA provides that the provisions of the declaration and by-laws are severable, and that the declaration prevails over conflicting by-laws except to the extent the declaration is inconsistent with the UPCA. 68 Pa.C.S. § 5203. These protections exist for the benefit of unit owners and cannot be contracted away through a unilateral fee agreement imposed by the Board as a condition of exercising a Declaration-guaranteed right.

203.    The UPCA further requires that the declaration disclose any fees to be charged to

unit owners, see 68 Pa.C.S. §§ 5205, 5302, and the Rental Fee Program was never placed in the

Declaration through the required amendment process.

## CLASS ACTION ALLEGATIONS

204.    Plaintiffs bring this action individually and as a class action to Federal Rule of

Civil Procedure 23(b)(2) and/or (b)(3) on behalf of the following Classes:

**UTPCPL Class:** All persons who own or owned property within the Emerald Lakes planned community who (a) purchased their property primarily for personal, family, or household purposes, (b) while also renting it to others on a short-term basis (including through platforms such as AirBnB and VRBO); who (c) paid charges under the Rental Fee Program as a condition of renting; and (d) paid any such rental registration fee, rental plan or rental-tier fee, per-rental fee, or rental-related fine to the Association under the Rental Fee Program at any time during the six (6) years preceding the filing of this Complaint through the date of trial.

**UPCA Restitution Class:** All persons and entities, including corporations, limited liability companies, and other business entities, who own or owned property within the Emerald Lakes planned community and who paid any rental registration fee, short-term rental plan or rental-tier fee, Long Term Rental Fee, or per-rental fee to the Association under the Rental Fee Program at any time during the four (4) years preceding the filing of this Complaint through the date of trial, regardless of the purpose for which the property was purchased, including property purchased or held solely for investment or commercial purposes.

**Rental-Related Fines Class:** All persons and entities, including corporations, limited liability companies, and other business entities, who own or owned property within the Emerald Lakes planned community and who paid any rental-related fine for late registration of a rental or guest, for failing to register a rental or guest at all, for renting while not in good standing, for unregistered or "illegal" rentals, guest-pass fines, and "Nuisance Rental Property" fines, to the Association under the Rental Fee Program at any time during the four (4) years preceding the filing of this Complaint through the date of trial, regardless of the purpose for which the property was purchased, including property purchased or held solely for investment or commercial purposes.

205.    The UTPCPL Class, the UPCA Restitution Class, and the Rental-Related Fines

Class are referred to collectively as the "Classes." Excluded from each of the Classes are the

Association, its officers and directors, and the judicial officers and their immediate family

members and associated court staff assigned to this case.

36

206.    **Numerosity** (Fed. R. Civ. P. 23(a)(1)). Each of the Classes is so numerous that joinder of all members is impracticable. On information and belief, the Classes consist of hundreds of owners who have paid rental fees, charges, or fines under the Rental Fee Program, and the Association currently administers approximately 297 short-term rentals and approximately 125 long-term rentals within the community. The precise number and identities of Class members are readily ascertainable from the Association's own records, including its rental registration records, fee and fine ledgers, and the Association's Enumerate Engage and Enumerate Central systems.

207.    **Commonality and Predominance** (Fed. R. Civ. P. 23(a)(2)). There are many questions of law and fact common to the claims of Plaintiff and the members of the Classes, and those questions predominate over any questions that may affect individual members of the Classes. Common questions for the Classes include, but are not necessarily limited to, the following:

(a) whether the Declaration authorizes the Association to impose fees, charges, or fines as a condition of renting;

(b) whether the By-Laws authorize the Rental Fee Program;

(c) whether the Rental Fee Program was adopted without the membership approval required to amend the Declaration or the By-Laws;

(d) whether the Rental Fee Program conflicts with the Declaration and is therefore void under 68 Pa.C.S. § 5203(c);

(e) whether renting is a permitted residential use under the Declaration;

(f) whether the Association's delegation of fee-setting authority to management was authorized;

(g) whether the Association's representation and enforcement of the Rental Fee Program as a valid, legally enforceable obligation constituted deceptive conduct creating a likelihood of confusion or misunderstanding under the UTPCPL;

(h) whether the Rental Fee Program is void and unenforceable; and

(i) damages.

208. The Association's conduct toward the UTPCPL Class was uniform and is susceptible to common, classwide proof. The Association issued to renting Owners standardized written invoices, billing statements, and good-standing notices, generated through a common billing system, that uniformly presented the Rental Fee Program charges as valid, due, and owing obligations of Association membership, payable as a condition of remaining in good standing and of renting.

209. **Typicality** (Fed. R. Civ. P. 23(a)(3)). Plaintiffs' claims are typical of the claims of the Classes. Each Plaintiff, like every Class member, owns or owned property within Emerald Lakes subject to the same Declaration and By-Laws, and has been subjected to and has paid charges and fines under the same unauthorized Rental Fee Program.

210. Every Plaintiff's claim arises from the same course of conduct, namely the Association's imposition and collection of the unauthorized Rental Fee Program, and is based on the same legal theory, namely that the Rental Fee Program is void and unenforceable and that the amounts collected under it must be returned.

211. **Adequacy** (Fed. R. Civ. P. 23(a)(4)). Plaintiffs will fairly and adequately protect the interests of the Classes. Plaintiffs have no interests antagonistic to those of the Classes, and have retained competent counsel experienced in complex and class litigation who will adequately represent the Classes.

212.    **Superiority** (Fed. R. Civ. P. 23(b)(3)). Class action treatment is superior to the alternatives for the fair and efficient adjudication of the controversy alleged herein. Such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would entail. There are hundreds of Class members in each Class, such that joinder of all members is impracticable.

213.    In addition to satisfying the prerequisites of Fed. R. Civ. P. 23(a), Plaintiffs satisfy the requirements for maintaining a class action under Fed. R. Civ. P. 23(b) because: (a) the prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudications which would establish incompatible standards of conduct for the Association; (b) the prosecution of separate actions by individual Class members would create a risk of adjudications with respect to them which would, as a practical matter, be dispositive of the interests of other Class members not parties to the adjudications, or substantially impair or impede their ability to protect their interests; (c) the Association has acted or refused to act on grounds that apply generally to the proposed Classes, namely its uniform imposition and enforcement of the Rental Fee Program against all renting owners, thereby making final injunctive relief and corresponding declaratory relief appropriate; and (d) questions of law or fact common to the members of the UTPCPL Class, the UPCA Restitution Class, and the Rental-Related Fines Class predominate over any questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

## COUNT I

## VIOLATION OF THE PENNSYLVANIA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION LAW

**(73 P.S. §§ 201-1 et seq.; on behalf of the UTPCPL Class)**

214.    Plaintiffs incorporate by reference each of the preceding paragraphs as though fully set forth herein.

215.    The UTPCPL prohibits unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce, 73 P.S. § 201-3, and is to be construed liberally to effectuate its remedial purpose of protecting consumers against unfair and deceptive practices.

216.    The UTPCPL's catchall provision prohibits "engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding." 73 P.S. § 201-2(4)(xxi).

217.    Plaintiffs and the members of the UTPCPL Class are consumers within the meaning of the UTPCPL. Each purchased property within Emerald Lakes primarily for personal, family, or household purposes. Because short-term rental is a residential, not a commercial, use under *Hura*, the personal and household character of the owners' purchases is defined by the rental of the properties for such purposes.

218.    The Association engaged in trade or commerce within the meaning of the UTPCPL. The 1975 Declaration expressly authorizes Owners to lease their homes. Rather than regulating a use the Declaration prohibits, the Association, through its Board and management company and without any authorization in the Declaration, the By-Laws, or the Rules, created a program under which an Owner must pay a fee of up to $2,750 per year and execute the Association's rental plan and registration forms as the price of the Association's permission to exercise a leasing right the Declaration already grants.

40

219.    The Association advertises the program, publishes its prices, and sells the rental "plans" to Owners in exchange for the right to rent. That conduct is the advertising, offering for sale, and sale or distribution of a service within the meaning of 73 P.S. § 201-2(3).

220.    The Rental Fee Program is *ultra vires*, illegal and void, but Emerald Lakes charged it anyway. As a result, the Association engaged in deceptive conduct that created a likelihood of confusion or misunderstanding. The Association represented to Plaintiffs and the other Owners, through the mandatory rental agreements, the Rules and Regulations, the "Renting in Emerald Lakes" bulletin, and its course of enforcement, that it had lawful authority to impose and collect the Rental Fee Program charges and that those charges were valid, enforceable obligations Owners were required to pay as a condition of renting.

221.    Those representations were false. The Declaration grants the unqualified right to rent, the governing documents require uniform assessments, and the charges were never authorized by any amendment of the Declaration or valid amendment of the By-Laws.

222.    The Association further failed to disclose to Plaintiffs and/or the other Owners that the Rental Fee Program was contrary to the Declaration, had never been approved through any required amendment process, and that Owners had the right to rent without paying the unauthorized charges.

223.    The Association never advised Plaintiffs and/or the other Owners of the *Hideout* decision and, even after being advised of it, continued to represent that the Rental Fee Program was lawful and to demand payment.

224.    Moreover, for those the association fined, the Association's own Rules and Regulations afford Members a right to appeal a fine within fifteen (15) days and to request a hearing before the Appeals Committee, yet the fine letters the Association sent to Mr. Torres

41

disclosed no such right and enclosed no appeal form, and instead demanded payment as fixed and owing.

225. By demanding payment of fines while withholding any notice of the right to appeal and to be heard, by declining to supply the appeal form, the Association denied Mr. Torres and other members of the UTPCPL Class who were fined the notice and opportunity to be heard that both its own Rules and Regulations and 68 Pa.C.S. § 5302(a)(11) require, and coerced Owners into paying fines the Association had no authority to impose, which constitute further unfair or deceptive acts or practices under the UTPCPL.

226. Plaintiffs and the members of the UTPCPL Class justifiably relied on the Association's representation that the Rental Fee Program charges were valid, authorized, and legally required obligations of membership. As a result of that reliance, Plaintiffs and the Class members sustained ascertainable loss in the amounts they paid.

227. As a direct and proximate result of the Association's deceptive conduct, Plaintiffs and the members of the UTPCPL Class suffered ascertainable losses of money, namely the rental registration fees, rental plan and rental-tier fees, per-rental fees, and rental-related fines they paid to the Association under the Rental Fee Program.

228. Plaintiffs and the members of the UTPCPL Class are therefore entitled to recover their actual damages or $100, whichever is greater, together with treble damages, attorneys' fees, and costs, under 73 P.S. § 201-9.2, as well as injunctive and declaratory relief.

229. The applicable limitations period for this claim is six years.

## COUNT II
### RESTITUTION AND STATUTORY RELIEF UNDER THE UNIFORM PLANNED COMMUNITY ACT FOR THE RENTAL FEE PROGRAM
**(68 Pa.C.S. § 5412; on behalf of the UPCA Restitution Class)**

230.    Plaintiffs incorporate by reference each of the preceding paragraphs as though fully set forth herein.

231.    Section 5412 of the UPCA provides that any person or class of persons adversely affected by a violation of the UPCA, the declaration, or the by-laws by any person subject to the UPCA has a claim for appropriate relief, and that the prevailing party may be awarded costs and reasonable attorney fees and, for willful violations, punitive damages. 68 Pa.C.S. § 5412.

232.    The Association violated the UPCA, the Declaration, and the By-Laws by adopting and enforcing the Rental Fee Program without authority, in conflict with the Declaration, and in excess of the Board's powers under 68 Pa.C.S. § 5302(a) and § 5203(c), as set forth above.

233.    The Association demanded and collected the Rental Fee Program fees from Plaintiffs and the UPCA Restitution Class without any authority under the Declaration, the By-Laws, or the UPCA.

234.    Plaintiffs and the members of the UPCA Restitution Class are persons and entities adversely affected by the Association's violations, having paid fees they had no legal obligation to pay.

235.    The Association's violations were willful. The Association imposed and continued to enforce the Rental Fee Program with knowledge that it lacked authority to do so, and in reckless disregard of the absence of any such authority.

236.    Plaintiffs and the members of the UPCA Restitution Class are entitled to appropriate relief under 68 Pa.C.S. § 5412, including restitution and disgorgement of all amounts paid under the Rental Fee Program during the four (4) years preceding the filing of this

Complaint through the date of trial, injunctive and declaratory relief, together with interest, costs, and reasonable attorney fees, and, for the Association's willful violations, punitive damages.

**COUNT III**

**RESTITUTION AND STATUTORY RELIEF UNDER THE UNIFORM PLANNED COMMUNITY ACT FOR RENTAL-RELATED FINES**

**(68 Pa.C.S. § 5412; by Plaintiff Christian Torres on behalf of the Rental-Related Fines Class)**

237. Plaintiffs incorporate by reference each of the preceding paragraphs as though fully set forth herein.

238. Section 5412 of the UPCA provides that any person or class of persons adversely affected by a violation of the UPCA, the declaration, or the by-laws by any person subject to the UPCA has a claim for appropriate relief, and that the prevailing party may be awarded costs and reasonable attorney fees and, for willful violations, punitive damages. 68 Pa.C.S. § 5412.

239. The Rental Fee Program's schedule of rental-related fines was adopted and is enforced without authority under the Declaration, the By-Laws, or the UPCA. The Declaration and By-Laws confer no power to impose fines as a condition of, or penalty for, renting, and the By-Laws' only disciplinary powers, set forth in Article XI, Section 2(b), do not authorize the rental-related fines or the suspension of rental privileges, and cap any suspension of facilities access at thirty days per breach.

240. The Association violated the UPCA, the Declaration, and the By-Laws by adopting and enforcing the rental-related fines without authority, in conflict with the Declaration, and in excess of the Board's powers under 68 Pa.C.S. § 5302(a) and § 5203(c), as set forth above. The Association separately violated the UPCA by assessing and collecting the rental-

related fines without the notice and opportunity to be heard that 68 Pa.C.S. § 5302(a)(11) requires, as set forth below.

241. The Association demanded and collected rental-related fines from Plaintiff Christian Torres and the members of the Rental-Related Fines Class without any authority under the Declaration, the By-Laws, or the UPCA.

242. Independent of the Association's lack of any authority to impose the rental-related fines at all, the manner in which the Association assessed and collected those fines violated the UPCA. Section 5302(a)(11) permits an association to impose fines only after notice and an opportunity to be heard. 68 Pa.C.S. § 5302(a)(11).

243. Plaintiff Christian Torres and the members of the Rental-Related Fines Class are persons and entities adversely affected by the Association's violations, having paid rental-related fines they had no legal obligation to pay. Neither the rental agreements the Association compelled Owners such as Mr. Torres to sign, nor the fact that Owners such as Mr. Torres paid the fines, bars relief, for the reasons set forth above.

244. The Association's violations with respect to the rental-related fines were willful. The Association assessed, demanded, and collected the rental-related fines with knowledge that it lacked authority to impose them, and in reckless disregard of the absence of any such authority.

245. Plaintiff Christian Torres and the members of the Rental-Related Fines Class are entitled to appropriate relief under 68 Pa.C.S. § 5412, including restitution and disgorgement of all rental-related fines paid under the Rental Fee Program during the four (4) years preceding the filing of this Complaint through the date of trial, injunctive and declaratory relief, together with

45

interest, costs, and reasonable attorney fees, and, for the Association's willful violations, punitive damages.

**<u>PRAYER FOR RELIEF</u>**

**WHEREFORE,** Plaintiffs, individually and on behalf of all others similarly situated, respectfully request that this Court:

(A)    Enter an order certifying this action as an appropriate class action pursuant to Federal Rules of Civil Procedure 23(b)(2) and (3), certifying the UTPCPL Class, the UPCA Restitution Class, and the Rental-Related Fines Class;

(B)    Enter an order appointing Plaintiffs Shelton, Christian Torres, and M&P as Representatives of the UTPCPL and UPCA Restitution classes, and Plaintiff Christian Torres as Representative of the Rental-Related Fines Class;

(C)    Enter an order appointing Plaintiffs' counsel as Class Counsel;

(C)    Enter a declaratory judgment that the Rental Fee Program and associated fines are *ultra vires*, null, void, and unenforceable;

(C)    Enter appropriate injunctive relief under both the UTPCPL and UPCA barring the Association from imposing, charging, collecting, or enforcing the Rental Fee Program or associated fines, and ordering the Association to reverse all outstanding charges and fines and remove all related liens, suspensions, and "not in good standing" designations;

(D)    Award actual and treble damages, together with attorneys' fees and costs, under the UTPCPL of all rental fees and fines collected under the Rental Fee Program during the six years preceding the filing of this Complaint through the date of trial;

(E)    Award restitution and disgorgement of all rental fees and fines collected under the Rental Fee Program during the four (4) years preceding the filing of this Complaint through the date of trial, together with punitive damages for willful violations, and attorneys' fees and costs,

under the UPCA, 68 Pa.C.S. § 5412, on behalf of the UPCA Restitution Class and Rental-Related Fines class;

    (F)    Award pre-judgment and post-judgment interest and;

    (G)    Grant such other and further relief as the Court deems just and proper.

## JURY TRIAL DEMAND

Plaintiffs hereby demand a trial by jury on all claims so triable.

Plaintiff,
By Counsel

Dated: August 11, 2026

*/s/ Andrew Roman Perrong*
Andrew Roman Perrong, Esq.
Perrong Law LLC
1669 Edgewood Road, Suite 218
Yardley, PA 19067
Phone: 215-225-5529 (CALL-LAW)
Facsimile: 888-329-0305
a@perronglaw.com

*Attorney for Plaintiff and Proposed Class*

47