**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**
**SCRANTON DIVISION**

| | |
|---|---|
| **JAMES EVERETT SHELTON, CHRISTIAN TORRES, and M&P REAL ESTATE INVESTORS LLC, a New Jersey limited liability company,** individually and on behalf of all others similarly situated, | CIVIL ACTION – LAW |
| Plaintiffs | No. 3:26-cv-02320-KM |
| v. | (Judge Mehalchick) |
| **EMERALD LAKES ASSOCIATION, INC.** | JURY TRIAL DEMANDED |
| Defendant | |

**<u>BRIEF IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS</u>**

# TABLE OF CONTENTS

I. COUNTER-STATEMENT OF PROCEDURAL HISTORY ..................... 1

II. COUNTER-STATEMENT OF FACTS .................................................. 1

III. COUNTER-STATEMENT OF QUESTIONS INVOLVED.................... 3

IV. LEGAL STANDARD.......................................................................... 4

V. ARGUMENT ........................................................................................ 4

A. Plaintiffs state viable UPCA claims. .................................................... 4

i. The Declaration does not authorize the challenged charges. ............... 4

a. ELA conflates use restrictions and building restrictions. .............. 5

b. ELA misinterprets the Declaration. .............................................. 9

c. ELA's general authority cases are distinguishable. ..................... 11

d. Even if general authority existed, the fees are unlawful because they are grossly disproportionate. ............................................................... 13

ii. ELA's distinctions and other authorities do not displace *Chan*........ 16

B. Plaintiffs state a viable UTPCPL claim, and dismissal of Count I would not defeat jurisdiction. ........................................................................... 19

i. CAFA jurisdiction attached at filing. ............................................... 19

ii. The pleaded transactions fall within the UTPCPL. ..........................20

iii. The Complaint alleges deceptive conduct, reliance, and loss. ........23

VI. CONCLUSION..........................................................................25

## TABLE OF AUTHORITIES

**Cases** **Page(s)**

*Auto-Owners Ins. Co. v. Stevens & Ricci Inc.*, 835 F.3d 388 (3d Cir. 2016) ..........20

*Chan v. Ass'n of Prop. Owners of the Hideout, Inc.*, 323 A.3d 92 (Pa. Cmwlth. 2024), *appeal denied*, 333 A.3d 1250 (Pa. 2025) ........................*passim*

*Coba v. Ford Motor Co.*, 932 F.3d 114 (3d Cir. 2019)..........20

*Connelly v. Lane Constr. Corp.*, 809 F.3d 780 (3d Cir. 2016)..........4

*Gregg v. Ameriprise Fin., Inc.*, 245 A.3d 637 (Pa. 2021)..........23

*Halpern v. Ricoh U.S.A., Inc.*, 353 A.3d 1264 (Pa. 2026) ..........24

*Harold v. Richards*, 334 F. Supp. 3d 635 (E.D. Pa. 2018)..........4

*Hess v. Barton Glen Club, Inc.*, 718 A.2d 908 (Pa. Cmwlth. 1998)..........11, 12

*Jones v. Park Lane for Convalescents*, 120 A.2d 535 (Pa. 1956)..........5, 7, 8, 17

*Laborers' Int'l Union v. Foster Wheeler Corp.*, 26 F.3d 375 (3d Cir. 1994) ..........16

*Lake Harmony Estates Prop. Owners Ass'n v. M4 Holdings*, Nos. 16-0472 & 16-0473, slip op. (CCP Carbon County July 1, 2021)..........14, 18

*Lal v. Ameriquest Mortg. Co.*, 858 A.2d 119 (Pa. Super. 2004)..........22

*M4 Holdings, LLC v. Lake Harmony Ests. Prop. Owners' Ass'n*, 237 A.3d 1208 (Pa. Cmwlth. 2020) ..........15

*Pane v. Indian Rocks Prop. Owners Ass'n, Inc. of Ledgedale*, 167 A.3d 266 (Pa. Cmwlth. 2017) ....15, 18

*Pastore v. Lake Shore Maint. Ass'n*, 178 A.2d 776 (Pa. Super. 1962) ....12, 13, 18

*Reilly v. Arrowhead Lake Cmty. Ass'n*, Monroe CCP, No. 8215-CV-2022 (2026) ....6, 7, 19

*Ruffed Grouse Ridge Owners' Ass'n v. Hura*, 317 A.3d 665 (Pa. Cmwlth. 2024) ....6, 8, 9, 12, 17, 19, 23

*Schulman v. Serrill*, 246 A.2d 643 (Pa. 1968) ....7, 8

*Slice of Life, LLC v. Hamilton Twp. Zoning Hearing Bd.*, 207 A.3d 886 (Pa. 2019) ....8, 19

*St. Paul Mercury Indem. Co. v. Red Cab Co.*, 303 U.S. 283 (1938) ....20

*Travis v. State Auto Mut. Ins. Co., Inc.*, No. CV 21-5395, 2023 WL 2163975 (E.D. Pa. Feb. 22, 2023) ....22

*Valley Forge Towers S. Condo. v. Ron-Ike Foam Insulators, Inc.*, 574 A.2d 641 (Pa. Super. 1990) ....20

**Statutes** **Page(s)**

28 U.S.C. § 1332(d)(2) ....1

68 Pa.C.S. § 5203(c) ....16, 18

68 Pa.C.S. § 5219(a)(1) ....13

68 Pa.C.S. § 5302(a) ....18

68 Pa.C.S. § 5302(a)(11) ....1, 15, 16

68 Pa.C.S. § 5302(a)(16) ....18, 19

68 Pa.C.S. § 5303(a) ....14

68 Pa.C.S. § 5314(b) ....13

68 Pa.C.S. § 5314(c)(2) ....13

68 Pa.C.S. § 5315(g) ....14

68 Pa.C.S. § 5412 .......... 1, 20

73 P.S. § 201-2(4)(xxi) .......... 23

**Rules** **Page(s)**

Fed. R. Civ. P. 9(b) .......... 23

Fed. R. Civ. P. 12(b)(6) .......... 4

M.D. Pa. L.R. 7.1 .......... 3

**Other Materials** **Page(s)**

Compl., ECF 1 .......... *passim*

Def.'s Br. Supp. Mot. Dismiss, ECF 11 .......... *passim*

Declaration, ECF 11-4 .......... *passim*

## I. COUNTER-STATEMENT OF PROCEDURAL HISTORY

Plaintiffs filed this class action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). ECF 1. Count I arises under the UTPCPL. Counts II and III seek restitution under 68 Pa.C.S. § 5412 of Rental Fee Program charges and of rental fines imposed without the notice and hearing § 5302(a)(11) requires.

## II. COUNTER-STATEMENT OF FACTS

Plaintiffs do not claim to be exempt from generally applicable rules. Rather, they contend that ELA may not charge them up to $2,750 a year for permission to exercise their inherent property right to rent, fine them up to $1,000 per occurrence, and threaten to suspend their right to rent for six months, when neither the Declaration nor the By-Laws authorize any of it. Compl. ¶¶ 128-129.

The Declaration contains fourteen paragraphs recorded in 1975 by the developer, Unidel Corp. ECF 11-4 ("Declaration"). Paragraph 1 contains two sentences. The first, a use restriction, provides that "[t]he premises to be conveyed shall be used for residential purposes only." The second, a building restriction, provides that "[n]o building shall be erected, altered, placed or permitted to remain on the premises other than one detached single-family dwelling, not to exceed two stories in height, and a private garage for not more than two cars." Declaration ¶ 1. The words "single-family" appear only in the second sentence, a building restriction, not a use restriction. Most of the remaining paragraphs address physical

matters such as sewage, easements, pets, and fences. Paragraph 9 restricts *use* of "the lakes and recreational areas" to members in good standing and limits membership eligibility to purchasers and "lessees of lot owners." Paragraph 10 requires grantees and their successors to remain members. Paragraph 11 requires "specific permission of Grantor" for "For Rent" signs. Paragraph 14 provides for enforcement by Grantor "by appropriate action at law or in equity." The Declaration mentions ELA only in paragraphs 9 and 10, and only to describe membership in the association insofar as it pertains to the use of ELA's lakes and recreational areas and owners' duties of membership. It confers no power on ELA to impose rental restrictions or charges.

Plaintiffs Shelton and Torres each bought vacation homes in 2023 for personal use, stay there throughout the year, and rent only when away. Compl. ¶¶ 44-47, 50-52. ELA sells rental "plans" in tiers priced at $2,500, $2,000, $1,400, and $35 per rental, plus a $250 registration fee, on top of the same $1,280 annual dues every non-vacant lot owner pays. *Id.* ¶¶ 107-121, 140. The charges bear no relation to cost and rise with rental frequency. *Id.* ¶¶ 96-98, 117, 141. ELA's General Manager told owners that the Board "has no say or power over the program." *Id.* ¶ 145. In March 2026, management attempted to raise the top tier by $900 by email but rescinded the increase by email three days later. *Id.* ¶¶ 146-153.

ELA's Board received a copy of *Chan v. Ass'n of Prop. Owners of the Hideout, Inc.*, 323 A.3d 92 (Pa. Cmwlth. 2024), appeal denied, 333 A.3d 1250 (Pa. 2025), in January 2025 and kept charging those fees. *Id.* ¶¶ 154-157. Mr. Torres paid $1,980 in fines in reliance on their represented validity. ELA's fine letters did not disclose his right to appeal or his right to a hearing. *Id.* ¶¶ 55-69, 224-225.

Finally, ELA's Local Rule 7.1 certificate states that counsel conferred "regarding the foregoing" brief, ECF 11-1, but did so only to the UTPCPL count. Plaintiffs were never told ELA would move against the UPCA counts.

## III. COUNTER-STATEMENT OF QUESTIONS INVOLVED

1. Whether the Declaration authorizes charges, fines, and suspensions for the exercise of a rental right that ELA concedes the Declaration does not explicitly restrict?

Suggested answer: No.

2. Whether dismissal of Count I defeats CAFA jurisdiction?

Suggested answer: No.

3. Whether Count I plausibly alleges a sufficient claim under the UTPCPL because it alleges a covered consumer transaction, deceptive conduct, reliance, and loss?

Suggested answer: Yes.

## IV. LEGAL STANDARD

Rule 12(b)(6) requires the Court to accept well-pleaded facts as true and draw reasonable inferences in Plaintiffs' favor. *Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 790 (3d Cir. 2016). Although Rule 12(b)(6) is ordinarily confined to the four corners of a complaint, a court may properly consider materials relied upon in the complaint. *Harold v. Richards*, 334 F. Supp. 3d 635, 639 (E.D. Pa. 2018). Considering the Declaration, however, does not permit the Court to assume disputed facts about those documents. *See id.*

## V. ARGUMENT

### A. Plaintiffs state viable UPCA claims.

#### i. The Declaration does not authorize the challenged charges.

ELA's concessions doom its motion. ELA states that "[t]here is no dispute that ELA's Declaration generally provides for the right of owners to rent properties within the community" Br. 13. It states that it "agrees that this language provides a clear right for owners to rent their properties." Br. 13. And it states again that it "does not dispute that owners have the right to rent." Br. 16. And it identifies no specific "restrictions" in the Declarations that permit the program.

Those concessions leave ELA in a corner. Either renting is explicitly restricted or it is not. ELA concedes that the Declaration permits owners to rent. And if renting is permitted, then the Rental Fee Program is a charge on a permitted use, and ELA must identify the use restriction that authorizes it to charge owners

for exercising an otherwise unrestricted right to use the property. It identifies none. If renting is restricted, then ELA's remedy is to enforce any restrictive covenant "by appropriate action at law or in equity," Declaration ¶ 14, not to sell annual permission to violate the alleged restriction. An association does not cure an alleged covenant violation by monetizing it. The fee program itself presupposes that renting is allowed, because no one pays for permission to do what is forbidden. Under either possibility, the fees fail. The same concession undoes ELA's UTPCPL argument, which needs renting to be a commercial enterprise. Renting cannot be a residential right in one section of ELA's brief and a commercial venture in another.

#### a. ELA conflates use restrictions and building restrictions.

ELA's argument that paragraph 1 supports the program combines two different, and distinct, sentences. To see why, it is important to understand the difference between a *use restriction* and a *building restriction*. Pennsylvania law divides restrictive covenants into two categories. Use restrictions govern "the purposes for which the buildings are used, the nature of their occupancy, and the operations conducted therein," while building restrictions "are concerned with the physical aspect or external appearance of the building." *Chan*, 323 A.3d at 103 (quoting *Jones v. Park Lane for Convalescents*, 120 A.2d 535, 538 (Pa. 1956)).

The first sentence of paragraph 1 is the Declaration's only relevant use restriction on occupancy. It provides that "[t]he premises to be conveyed shall be *used* for residential purposes only." Declaration ¶ 1 (emphasis added). Renting complies with this restriction. In *Ruffed Grouse Ridge Owners' Ass'n v. Hura*, 317 A.3d 665, 670 (Pa. Cmwlth. 2024), the Commonwealth Court held that even short-term renters *use* a home residentially because they are "using the Property in its entirety to sleep, eat, bathe and generally reside," and that the association had "incorrectly focuse[d] on the duration of the rentals rather than on the purpose of the renters' physical use of the Property." A residential use covenant prohibits operating "a business or commercial enterprise, such as a professional office, retail store, or corporate meeting space," *not* "rental of the Property to private individuals for residential use." *Id.* at 671. The cases bear that out. Residential use covenants have been enforced against an accounting office and an automobile and snowmobile repair shop, not against a family renting a lake house for a week. *Id.* (citing cases). Even if an owner rents purely for profit, the renters still *live* in the home, and *that* is a residential *use*. *Id.*

To be sure, a declaration's use restriction may restrict rentals or subject them to fees, as Arrowhead's covenants did by expressly conditioning any rental use on prior association approval. *Reilly v. Arrowhead Lake Cmty. Ass'n*, Monroe CCP,

No. 8215-CV-2022, ECF 11-5 at 6, 11, 13-14. But ELA's Declaration contains no such provision, and its residential use covenant cannot be read to supply one.

The second sentence is a building restriction not at issue here. It provides that "[n]o *building* shall be *erected, altered, placed* or permitted to *remain* on the premises other than one detached single-family dwelling, not to exceed two stories in height, and a private garage for not more than two cars." Declaration ¶ 1 (emphasis added). That sentence governs what may be *built*, not how the building may be used. An owner could not build a four-car garage or a third story, even though either would be entirely consistent with residential use. The words "single-family" describe the *structure*, not how it is occupied. And "[a] building restriction and a use restriction are wholly independent of one another," so that "the one is not to be extended so as to include the other unless the intention to do so is expressly and plainly stated." *Chan*, 323 A.3d at 103 (quoting *Schulman v. Serrill*, 246 A.2d 643, 646 (Pa. 1968)). Consistent with the principle that "any restriction . . . should be plainly expressed and not left to implication," *id.* at 104-05 (quoting *Jones*, 120 A.2d at 539), the Declaration goes no further. It does not regulate square footage, the number of bedrooms, or the layout of the home, beyond what zoning law requires, and it says nothing about who may occupy the dwelling or for how long.

The problem with ELA's argument is that ELA reads the use restriction and the building restriction together as a restriction to "single family residential

purposes." Br. 14. That is not the instrument's language. Building restrictions and use restrictions are distinct, and neither is extended to include the other unless the intention is expressly and plainly stated. *See Jones*, 120 A.2d at 538-39; *Schulman*, 246 A.2d at 646; *Chan*, 323 A.3d at 104-05. Read correctly, therefore, the only *use* restriction in the Declaration is for "residential purposes." Under *Ruffed Grouse*, renting is a residential use. 317 A.3d at 670-71. Renting therefore complies with the only use restriction there is. It follows that there is no source of authority to charge for conduct incident to the right of ownership which the covenant does not explicitly restrict.

A restrictive covenant limits the grantee and may be enforced by the covenantee. It is not a delegation of implied restrictive regulatory power not explicitly stated, and ELA cites no case treating it as one. Restrictive covenants are also construed strictly against the party seeking to enforce them and in favor of the free use of property. *Ruffed Grouse*, 317 A.3d at 669-70. ELA's reliance on *Slice of Life, LLC v. Hamilton Twp. Zoning Hearing Bd.*, 207 A.3d 886 (Pa. 2019), fails for the reason ELA itself acknowledges, which is that the case interpreted a zoning ordinance. Br. 14 n.4.

Indeed, *Ruffed Grouse* expressly rejected the association's reliance on *Slice of Life*, holding it "inapposite" because *Slice of Life* depended on zoning provisions defining "family" and "single housekeeping unit," terms absent from the covenant

there and absent here. 317 A.3d at 671-72, 671 n.7. Zoning and private covenants differ in purpose, application, and interpretation. A zoning ordinance is a municipality's legislative exercise of the police power enacted for public ends. A restrictive covenant is a private contract, construed according to "the intention of the parties at the time of the contract," which "must be ascertained from the entire instrument." *Ruffed Grouse*, 317 A.3d at 669. A definition Hamilton Township wrote into its zoning ordinance cannot supply a restriction not in the Declaration.

And *Ruffed Grouse* did so on covenant language stronger than ELA's, which barred commercial use and limited use strictly to "private residential purposes only." *Id.* at 670. The association there conceded that annual and six-month rentals were permitted but argued that rentals under thirty days were not. The court held that duration was the wrong focus, because the covenant made no distinction between short-term and long-term rentals. *Id.* Neither does ELA's.

**b. ELA misinterprets the Declaration.**

ELA also misstates the contents and legal effect of its own Declaration. Paragraph 9 restricts use of the *lakes and recreational areas* to members in good standing and provides that membership "is limited to" purchasers of lots and lessees of lot owners. Paragraph 10 separately provides that "[t]he Grantees, their heirs, executors, administrators, successors or assigns agree to become and remain members in good standing," and the by-laws condition "good standing" on being

current on any fees "*properly chargeable* to the Member." Compl. ¶130. Whether the rental charges are *properly chargeable*, not whether a member is in good standing, is the question in this case. Those are different concepts. A provision that membership is limited to two classes identifies who may join. It does not require every member of those classes to join. And paragraph 10, the only mandatory membership provision, does not mention lessees.

Yet immediately after quoting both provisions, ELA asserts that the Declaration contains "mandatory membership within ELA for owners and lessees." Br. 3; *see* Br. 13, 20 n.6. That proposition is not in the quoted language. ELA has taken the word "lessees" from paragraph 9 and inserted it into paragraph 10. The Declaration conditions *use of the lakes* on membership. It does not condition an owner's *right to lease a private lot* on the tenant becoming a member. ELA nonetheless rests its theory that the right to rent is "specifically conditioned on membership in ELA," Br. 13, and its footnote 6, on that inserted word. Paragraph 9, meanwhile, says nothing about use of the dwelling. If anything, it cuts against ELA, since it already grants lessees the amenity access that ELA now charges $600 a year to provide. Compl. ¶¶ 113-116.

ELA likewise restates paragraph 11 as requiring "prior approval from ELA" for "For Rent" signs. Br. 13. A power to restrict rental *signage* by the Grantor and its assigns is not a power to charge for rentals. Moreover, this actually supports

Plaintiffs because it shows the drafters knew how to condition conduct on permission. Clause a) on page 2 also addresses commercial use of lakeshore land. They did so for signs and use of the lake shore, and not for renting.

The same slippage drives ELA's central premise, that "the express grant of a right of use (for rental purposes)" combined with "express use restrictions (on the right to use and rent)" requires a finding that ELA may regulate rentals. Br. 14. But that argument ignores the fact that the Declaration contains neither. It has no provision restricting rental rights and none regulating rental duration, frequency, fees, registration, tenant membership, or an owner's ability to lease. To be sure, rentals are contemplated, since the Declaration refers to "lessees" and "For Rent" signs. But it follows that owners may rent because nothing restricts it, and restrictions must be clear and unmistakable. ELA upgrades passing references into express regulatory provisions that do not exist and then treats them as the source of its authority. This it may not do. *Chan*, 323 A.3d at 104-05.

**c. ELA's general authority cases are distinguishable.**

ELA's general powers cases do not fill the gap. ELA reads them to establish that "associations enjoy an inherent ability to regulate activity within their communities unless an express prohibition exists in the covenants." Br. 16. That is not what they hold. *Hess*, *Fogarty*, *Meadow Run*, and *Spinnler Point* all address a different problem, which is requiring owners who benefit from common roads,

lakes, and facilities to pay their proportionate share of maintaining them. *E.g.*, *Hess v. Barton Glen Club, Inc.*, 718 A.2d 908, 912 (Pa. Cmwlth. 1998) ("proportionate costs of common improvements") (citing *Fogarty*). Besides, the proposition that associations enjoy inherent authority "unless an express prohibition exists in the covenants" gets the analysis exactly backwards, since *Chan*, 323 A.3d at 104-05, makes clear that authority must be clear and not left to implication.

Where the recorded covenant draws no distinction between short-term and long-term rentals, an association cannot derive one by implication from a general residential use covenant. Doing so creates a new use restriction rather than enforcing the recorded one. *Ruffed Grouse*, 317 A.3d at 670-71. This is evident because the Rental Fee Program falls on a subset of owners, *on top of* the dues everyone pays, in amounts that rise with rental frequency rather than cost, set by management rather than the membership. Compl. ¶¶ 96-98, 117, 137, 140-153. It treats renters differently not only from non-renting owners but from one another. The unequal treatment is itself evidence that ELA is creating a new restriction rather than interpreting an existing one.

*Pastore v. Lake Shore Maint. Ass'n* illustrates what is missing here. The recorded covenant there contained a building restriction expressly requiring construction plans to be presented to and approved in writing by the association. 178 A.2d 776, 777 (Pa. Super. 1962). The challenged charges were a $125 road

damage fee and a 0.3% building permit fee tied to that approval process. *Id.* at 777-78. The court called them service charges "fixed as a matter of administration" and found them reasonable. *Id.* But ELA contends that an association with no express rental approval power may impose thousands of dollars in annual charges as a precondition to an otherwise permitted use of a private dwelling. *Pastore* does not stand for that, and Plaintiffs in any event plead these charges are not administrative. Compl. ¶¶ 141, 152-153.

ELA's remaining answer is that, without the program, it would be "blind to a significant portion of its membership." Br. 20 n.6. That is a policy argument, not an argument about authority. In any event, Plaintiffs do not challenge ELA's ability to know who is in the community. An association may collect non-restrictive information about who uses a property without charging $2,750 a year for the express right to rent. And if ELA wants powers its Declaration does not give it, the UPCA provides an amendment process. 68 Pa.C.S. § 5219(a)(1). ELA has never used it. Compl. ¶¶ 102-104.

**d. Even if general authority existed, the fees are unlawful because they are grossly disproportionate.**

Alternatively, even if some fee authority existed (it does not), the pleaded program is unlawful because it is grossly disproportionate. Section 5314(b) of the UPCA requires expenses *permitted by the declaration* to be assessed against all units according to allocated liability, and § 5314(c)(2) permits an expense

benefiting fewer than all units to be assessed only against those units. In *Lake Harmony Estates Prop. Owners Ass'n v. M4 Holdings*, Nos. 16-0472 & 16-0473, slip op. at 6-9 (CCP Carbon County July 1, 2021), the court held a rental registration fee unenforceable under the UPCA because its revenue funded security, trash, beach, road maintenance, and reserves benefiting all units, and none was allocated to the *actual costs* of administering the rental program. The court held that any rental fee must address "the actual costs of administration of a rental program," *id.* at 9, and ordered restitution with attorneys' fees under § 5315(g). The court also rejected the business judgment rule in favor of § 5303(a), the provision ELA invokes, Br. 15, despite finding no bad faith, because retaining improper fees would unjustly enrich the association. *Id.* at 8-9. Good faith is no defense.

The point of *Lake Harmony* is that any rental fee must treat renting owners alike, must be rationally tied to the *actual cost* of administering rentals, and must conform to the governing documents. Here, the Complaint pleads that the charges have no cost basis, rise with rental frequency, and appear in ELA's budgets as a revenue line. Compl. ¶¶ 12-13, 60, 96-98, 113-117, 141. The tiers also charge renting owners different amounts for the same permission depending on how often they rent. A fee untethered to cost, unequal among the owners who pay it, and set at management's discretion is arbitrary and capricious. Even if some implied

regulatory authority existed, it would not follow that ELA may impose materially different burdens on owners exercising the same right to rent, where the Declaration draws no distinction based on rental duration and the fee differences bear no relation to differences in cost. Even if the right to rent may be reasonably regulated, whether this program does so cannot be decided on the pleadings and is a factual question reserved for discovery.

The By-Laws and Count III supply independent grounds that ELA never addresses. Article X limits ELA to approved dues, special assessments, and "other assessments" for services that are "ordinary and necessary." Compl. ¶¶ 92, 95-98. Article XI, § 2(b) caps any suspension at thirty days and confers no power to suspend a right to rent. *Id.* ¶¶ 93-94, 174-180. Plaintiffs also plead that management, not the Board, sets the fees, and that an increase was announced by email. *Id.* ¶¶ 137-153. Notwithstanding that a board that acts by email has not validly adopted anything, *M4 Holdings, LLC v. Lake Harmony Ests. Prop. Owners' Ass'n*, 237 A.3d 1208, 1218 (Pa. Cmwlth. 2020), a program run by management, not the Board, cannot constrain an owner's use of property. *See Pane v. Indian Rocks Prop. Owners Ass'n, Inc. of Ledgedale*, 167 A.3d 266, 271 (Pa. Cmwlth. 2017). Only official Board action can do so. And Count III pleads fines imposed without the notice and hearing that § 5302(a)(11) requires. Compl. ¶¶ 240-245. ELA's brief does not mention Article X, Article XI, the delegation,

Count III, or § 5302(a)(11). ELA offers no argument addressing these theories and therefore no basis for dismissing them. *Laborers' Int'l Union v. Foster Wheeler Corp.*, 26 F.3d 375, 398 (3d Cir. 1994).

**ii. ELA's distinctions and other authorities do not displace *Chan*.**

*Chan* asked the same question presented here: whether the declaration authorized the association's rental regulations. *Chan* held that authorization for rental regulation was not provided in the declaration, so the bylaw was void and unenforceable under § 5203(c). *Chan*, 323 A.3d at 104-05. And the regulation in *Chan* did not merely cap short-term rentals at ten per year. It also required owners to enroll in a program for short-term rental and to pay annual fees while enrolled, just as here. *Id.* at 96. The Court in *Chan* did not evaluate whether the features of the challenged bylaw were reasonable, so ELA identifies a distinction without a difference. *Cf. id.* at 97.

The Court held the entire amendment void and unenforceable because "authorization for such regulation is not provided in the Declaration," *id.* at 105, even though, unlike here, the by-laws empowered the association to regulate common property and to do "everything necessary and proper," and even though the association had regulated rentals since 1977. *Id.* at 100, 97 n.3.

If the bylaw in *Chan* imposing enrollment and annual fees was void for want of Declaration authority, a fee schedule never approved by the membership and

administered by management fails here on stronger reasoning. ELA's Declaration gives the Grantor and its assigns only specific enumerated powers, including permitting signs (¶11), consenting to fences (¶12), and enforcing the covenants (¶14). But none of these enumerated powers concerns rental fees. It authorizes no rental charge or fee.

ELA's brief collapses two distinct questions. The first is authority, meaning whether the Declaration restricts the activity or delegates power to regulate it. The second is reasonableness, meaning whether a particular exercise of that power is reasonable and not arbitrary. A rule that is sensible as policy is still void if the governing instrument never empowered the board to adopt it. ELA fails at step one, because the Declaration does not regulate rentals or provide authority to do so.

As a result, *Jones*, *Chan*, and *Ruffed Grouse* end the inquiry. ELA says *Chan* is distinguishable on its facts because The Hideout's declaration contained only a building restriction while ELA's contains a use restriction. Br. 17-19. But *Chan* does not hold that the existence of any use restriction gives a board authority to regulate rentals however it wishes. ELA makes that leap on its own. Its argument runs from a residential use covenant, to an implied power to regulate rental use, to a power to divide renters into classes, to a power to charge those classes different fees. Each step requires authority. *Ruffed Grouse* forecloses the first, because rental is a "residential purpose." *Chan* forecloses the second, because rental

restrictions cannot be created outside a declaration that does not authorize them. And the use restriction ELA has is one that renting satisfies. A covenant that does not explicitly restrict a right inherent to real property ownership cannot authorize a fee for exercising that same right. Although an implementing rule need not appear in the Declaration, the Declaration must nevertheless supply a source of authority from which the rule can legitimately be derived. Reasonableness presupposes authority, and none exists here, just as in *Chan*.

Even assuming *arguendo* that authority exists, the rule was not validly adopted nor within the scope of that authority. A board's intentions or informal practices do not suffice, because only official action can constrain an owner's use of property. *Pane*, 167 A.3d at 271. And it is arbitrary and capricious because it treats renters differently and is unmoored to the costs of administering the program. *Pastore*, 178 A.2d at 777; *Lake Harmony*, slip op. at 7-8.

The UPCA does not grant fee-making authority that the Declaration does not confer as an initial matter. ELA invokes the power to "[e]xercise any other powers necessary and proper for the governance and operation of the association." Br. 15 (quoting 68 Pa.C.S. § 5302(a)(16)). But every power in § 5302(a), including that residual power, exists only "subject to the provisions of the declaration and the limitations of this subpart." 68 Pa.C.S. § 5302(a). Where an association's bylaws conflict with the declaration, the declaration prevails. *Id.* § 5203(c). Section

5302(a)(16) therefore cannot manufacture authority the Declaration withholds or alter rights the Declaration fixes. *Chan* confirms this point. The Hideout's bylaws empowered its association "to do everything necessary and proper" to accomplish its purposes, 323 A.3d at 100, and the rental bylaw was void anyway.

Nor does *Reilly* help ELA. It is on appeal, does not cite *Ruffed Grouse*, and turned on covenants that read nothing like ELA's. Arrowhead's covenants required that lots be "reserved *and used* for *single-family* residential purposes exclusively," barred owners from renting without prior approval for association membership, empowered the association to promulgate further rules as to uses, and provided that charges could be incurred for use of common facilities. ECF 11-5 at 6-7, 11-15. The court's *Slice of Life* analysis depended entirely on the word "used" being attached to "single-family." *Id.* at 12-13. ELA's use restriction says "residential," and ELA's Declaration contains no approval clause, no rulemaking power, and no charging power. *Reilly* was also decided on an agreed record after discovery, *id.* at 1-2, and says nothing about ELA's costs, procedures, or enforcement. It illustrates what a declaration must say to support a rental policy. ELA's does not.

### B. Plaintiffs state a viable UTPCPL claim, and dismissal of Count I would not defeat jurisdiction.

#### i. CAFA jurisdiction attached at filing.

Dismissal of Count I would not defeat jurisdiction, for two reasons. First, the amount in controversy inquiry is assessed at "the time that the complaint was

filed," and "[s]ubsequent events cannot reduce the amount in controversy so as to deprive the district court of jurisdiction." *Auto-Owners Ins. Co. v. Stevens & Ricci Inc.*, 835 F.3d 388, 395-96 (3d Cir. 2016). The rule also applies to CAFA. *Coba v. Ford Motor Co.*, 932 F.3d 114, 119 (3d Cir. 2019) (denial of class certification does not divest a court of CAFA jurisdiction).

Second, ELA's factual premise is wrong. The Complaint pleads more than $5,000,000 without any UTPCPL trebling, including roughly $3,100,000 in UPCA restitution alone, rental fines, attorneys' fees authorized by § 5412, punitive damages, and the value of an injunction against ELA's estimate of $863,000 in rental fee income for the coming fiscal year alone. Compl. ¶¶ 12-15. ELA addresses none of these components and does not show to a "legal certainty" that these aggregated claims are worth less than $5 million. *St. Paul Mercury Indem. Co. v. Red Cab Co.*, 303 U.S. 283, 289 (1938). Finally, remand is inappropriate because this action was not removed.

**ii. The pleaded transactions fall within the UTPCPL.**

ELA correctly identifies the inquiry under the UTPCPL as the *purpose* of the purchase, that is, whether a person made a purchase "primarily for personal, family or household purposes." Br. 6; *Valley Forge Towers S. Condo. v. Ron-Ike Foam Insulators, Inc.*, 574 A.2d 641, 644-45, 48 (Pa. Super. 1990). Shelton and Torres allege personal vacation home purchases, recurring personal occupancy,

and rentals when they are absent. Compl. ¶¶ 44-47, 50-52. That is a purchase primarily for personal, family or household purposes. The UTPCPL Class is limited to owners who purchased for such purposes. *Id.* ¶ 204. The rental plans those owners buy serve the same purpose, because ELA makes them a condition of both renting the home and keeping the household's standing in the community.

ELA argues that an assessment is not a purchase. Br. 8-9. Plaintiffs do not challenge an assessment. They challenge ELA's sale of rental "plans" that are intertwined with their ownership rights. ELA requires owners to select and pay for a plan before they may rent. That is the advertising, offering for sale, and sale of a service, and the purchaser is the residential property owner. What the owner buys is permission to exercise a right that already comes with owning a home at Emerald Lakes, because nothing in the Declaration restricts renting. And the purchase is bound up with the owner's own household use of the property. Every grantee must be a member in good standing, and only members in good standing may use the lakes and recreational areas.

ELA treats an owner who does not pay the rental charges or fines as not in good standing. Compl. ¶¶ 130-131. That status bars the *owner* and every member of his own household from the amenities and strips the owner of the right to vote and to serve on the Board. *Id.* ¶¶ 132-135. Those consequences do not end when renters leave. An owner who stopped renting tomorrow would remain barred from

the amenities they use *on their own time at their own home*, for as long as the charges remain unpaid.

ELA itself chose to enforce the rental program against the owner's *household* rather than against any *rental*. Whatever the character of a rental viewed in isolation, a charge enforced by withholding *a family's use of its own community* is a charge on the household use of the home. *Carey* and *220 W. Rittenhouse Square* concern ordinary common expense assessments, which Plaintiffs allege these charges are not. Compl. ¶¶ 95-98. ELA cannot describe the charges as payment for administration and amenity access when defending them under the UPCA and as payment for nothing when defending them under the UTPCPL.

ELA's authorities do not hold otherwise. *Lal* turned on property "purchased as an investment property rather than for personal, family or household purposes." Br. 7 (citing *Lal v. Ameriquest Mortg. Co.*, 858 A.2d 119, 125 (Pa. Super. 2004)). In *Lal*, the purchasers admitted they bought the property as an investment. *Id.* And in *Travis*, the court relied on the complaint and insurance documents showing that the plaintiff insured *thirteen separate rental properties*, none of which she personally occupied. *Travis v. State Auto Mut. Ins. Co., Inc.*, No. CV 21-5395, 2023 WL 2163975, at *1 (E.D. Pa. Feb. 22, 2023). *Hovagimian* and *Growall* both rested, after a judgment (and in *Growall*, on a jury verdict), on the same distinction. Here, by contrast, Shelton and Torres plead they bought vacation

homes for their own use, and actually live in them during the year. None of ELA's cases holds that a second home the owner personally occupies loses UTPCPL protection because it is also rented when the owner does not occupy it.

Nor does renting convert a personal purchase into a commercial one. *Ruffed Grouse* is not a UTPCPL case, but its holding that renters use a home residentially, 317 A.3d at 669-71, rejects the premise ELA's argument requires, that renting a home makes it a commercial enterprise. And purpose is a question of fact that cannot be resolved against Plaintiffs on the pleadings.

**iii. The Complaint alleges deceptive conduct, reliance, and loss.**

Count I proceeds under the catchall provision, 73 P.S. § 201-2(4)(xxi). In *Gregg v. Ameriprise Fin., Inc.*, 245 A.3d 637 (Pa. 2021), the Pennsylvania Supreme Court held that liability for deceptive conduct under that provision is strict and does not depend on the defendant's state of mind. *Id.* at 647-48, 649-50. A plaintiff need not prove fraud or negligent misrepresentation. The question is whether the conduct had the "tendency or capacity to deceive." *Id.* at 649. Count I therefore does not sound in fraud, and Rule 9(b) does not apply. Even if it did, the Complaint identifies the documents, the speakers, the dates, and the substance of each representation. Compl. ¶¶ 55-69, 106-129, 145-157, 208.

ELA's argument that a "disagreement over the law" cannot be deceptive, Br. 11-12, mistakes what is alleged. ELA did not simply state that it disagreed over

*Chan*. It demanded money to exercise a right fundamental to property ownership, renting, backed with oppressive remedies that it had no power to impose, including exclusion of the owner's entire household from the community's amenities. Compl. ¶¶ 119-121, 130-136. And ELA did this knowing that *Chan* had held a materially identical declaration was insufficient to support rental regulation. When the Board was presented with it, its president said that the Board could keep charging. *Id.* ¶¶ 154-155. Telling owners that a charge is a valid and enforceable condition of renting, when the association's own governing documents contain no authority for it, has an obvious capacity to mislead. ELA's assertion that its conduct was valid, and in the face of contrary law, is the very definition of conduct that is likely to cause confusion to the average consumer because it is an imprimatur on the very conduct at issue here. Whether it did so is a question of fact. *VonNieda-LaGrassa* is far afield, as it concerned competing readings of HUD regulations and involved no coercive demand for payment.

Moreover, Mr. Torres has stated a claim for deceptive omission because ELA at least had a duty to disclose that the fines were in excess of those permitted by ELA's governing documents after having affirmatively demanded payment as valid. *See Halpern v. Ricoh U.S.A., Inc.*, 353 A.3d 1264, 1279 (Pa. 2026). ELA's own Rules and Regulations confer a right of appeal, a right to a hearing, and limit

suspensions to 30 days. Compl. ¶¶ 57, 174, 224-225. ELA's fine letters failed to disclose they demanded more than the governing documents permit.

Reliance and loss are expressly pleaded. Plaintiffs and the class paid the tier and registration fees in reliance on ELA's representations, made through the mandatory registration forms, the Rules, the bulletin, and its course of enforcement, that the charges were valid and authorized. Compl. ¶¶ 119-121, 220, 226. Mr. Torres paid $1,980 in fines because he relied on ELA's representation that they were valid and required, without ever having been told of his right to appeal or to a hearing. Compl. ¶¶ 58-59, 69. Whether that reliance was justifiable is a question of fact. The loss is the money paid. *Id.* ¶ 227.

## VI. CONCLUSION

The motion should be denied in its entirety. Should the Court find any pleading deficiency, leave to amend is required unless amendment would be inequitable or futile.

Dated: October 1, 2026

*<u>/s/ Andrew Roman Perrong</u>*
Andrew Roman Perrong, Esq.
M.D. Pa. Bar #333687
Perrong Law LLC
1669 Edgewood Road, Suite 218
Yardley, PA 19067
Phone: 215-225-5529 (CALL-LAW)
Facsimile: 888-329-0305
a@perronglaw.com

## CERTIFICATE OF WORD COUNT

Pursuant to Local Rule 7.8(b)(2), I hereby certify that this brief contains 5,985 words and that a motion for leave to exceed the word count was granted (ECF No. 13).

DATED this October 1, 2026.

*/s/ Andrew Roman Perrong*

Andrew Roman Perrong, Esq.

## CERTIFICATE OF USE OF GENERATIVE AI

Pursuant to Judge Mehalchick's Civil Practice Order concerning the use of generative artificial intelligence, undersigned counsel certifies that Claude and WestLaw AI were utilized in connection with the preparation of this Brief in Opposition. The tools were utilized to assist with legal research, drafting of certain portions of the brief, and preparation of the Table of Authorities.

Undersigned counsel has independently reviewed and verified the accuracy of all material prepared with the assistance of generative artificial intelligence, including all citations and legal authorities.

**CERTIFICATE OF SERVICE**

I certify that I filed the foregoing via ECF on the below date, which will automatically send a copy to all attorneys of record on the case.

October 1, 2026

*/s/ Andrew Roman Perrong*
Andrew Roman Perrong, Esq.
Perrong Law LLC
1669 Edgewood Road, Suite 218
Yardley, PA 19067
Phone: 215-225-5529 (CALL-LAW)
Facsimile: 888-329-0305
a@perronglaw.com