**IN THE COURT OF COMMON PLEAS OF CARBON COUNTY, PENNSYLVANIA**
**CIVIL DIVISION**

| | | |
|---|---|---|
| LAKE HARMONY ESTATES PROPERTY OWNERS ASSOCIATION, Plaintiff | : | No. 16-0472 (M4) |
| v. | : | No. 16-0473 (Ledgestone) |
| M4 HOLDINGS and LEDGESTONE PROPERTIES, LLC, Defendants | : | |

Aaron M. DeAngelo, Esquire — Counsel for Plaintiff

James R. Nanovic, Esquire — Counsel for Defendants

**MEMORANDUM OPINION**

Serfass, J. - July 1, 2021

Lake Harmony Estates Property Owners Association (hereinafter "the Plaintiff") initiated two separate actions in this Court on March 9, 2016 - one against M4 Holdings, and one against Ledgestone Properties, LLC (hereinafter "the Defendants"). Complaints were filed on March 29, 2016. These actions relate to disputes between the parties concerning the validity of a rental registration fee imposed by the Plaintiff on Lake Harmony Estates property owners who rent out their properties on a short-term basis. The Defendants filed separate counterclaims against the Plaintiff to recover the rental registration fees paid and to seek an order from this Court determining that the rental registration fee is invalid and/or excessive. Due to the identical nature of the issues raised in both actions, the cases were consolidated for

purposes of judicial economy via order dated August 31, 2018. Following a non-jury trial before the undersigned and our review of the post-trial submissions of counsel, this matter is now ripe for final disposition.

**FACTUAL AND PROCEDURAL BACKGROUND**

Plaintiff is a non-profit property owners association that manages a planned community situated in Lake Harmony, Carbon County, Pennsylvania. The community, known as Lake Harmony Estates, consists of three hundred forty-one (341) parcels of land of which approximately one-third are used as rental properties. Defendants are two (2) single-use limited liability companies owned and operated by James Millspaugh as the sole member. Mr. Millspaugh became a property owner in Lake Harmony Estates with the purchase of 60 Estates Drive on April 27, 2011. He has since used this property as a residence. Mr. Millspaugh testified that when he became a property owner, he received a resale packet containing a book of governance which included language indicating that property owners are bound by the provisions of the deed and the bylaws, rules and regulations adopted by the Plaintiff. One such provision states that the sum paid annually by lot owners shall be proportionate with all other lot owners in the subdivision.

Mr. Millspaugh, through the Defendants, purchased five (5) additional rental properties situated in Lake Harmony Estates and

has actively held the properties open for rent, typically as short-term rentals lasting less than one (1) year[1]. The crux of this matter concerns the Plaintiff's imposition of a rental registration fee on property owners who rent or lease property within Lake Harmony Estates. On March 29, 2016, the Plaintiff filed complaints against Defendants claiming that M4 and Ledgestone failed to pay the 2015 rental registration fee of two hundred fifty dollars ($250.00) which was assessed to all renting property owners. Defendants have since paid the 2015 rental registration fee, but Mr. Millspaugh testified that he paid the 2015 fee and previous rental registration fees under protest in disagreement with the enforceability of such fees.

The rental registration fee in question was established on October 29, 2005 at the Plaintiff's Fall Semi-Annual Meeting. According to the minutes of that meeting, the rental registration fee was set at one hundred dollars ($100.00) to cover the costs of "administering the rental program and printing informational materials." On December 7, 2009, a letter was distributed to property owners stating that the fee was "not intended to be punitive in nature." The Plaintiff increased the fee from one hundred dollars ($100.00) to two hundred dollars ($200.00) at the

[1] M4 Holdings is the owner of two (2) properties within Lake Harmony Estates - 12 Lupine Drive and 17 Estates Drive. Ledgestone Properties, LLC is the owner of three (3) properties within Lake Harmony Estates - 713 Skye Drive, 100 Spring Street and 58 Knoll Drive.

Fall Semi-Annual Meeting on November 6, 2010, and from two hundred dollars ($200.00) to two hundred fifty dollars ($250.00) at the Board of Directors meeting on December 1, 2012. The minutes of a board meeting held on May 4, 2013, indicate that Attorney Sandy Mulhern, special counsel to Lake Harmony Estates, supported the fee so long as it addressed "costs of operation".

Following the fee increase to two hundred fifty dollars ($250.00), the Board of Directors conducted a review of the costs associated with renters. On December 16, 2015, a letter was distributed to property owners stating that there was a planned rental registration fee increase with an attached schedule in support and that all revenue generated from the rental registration fee would go into the capital reserve fund. The Board of Directors increased the rental registration fee from two hundred fifty dollars ($250.00) to four hundred seventy-five dollars ($475.00) at its annual meeting in December 2015. Mr. John Kline, a former board member and President of the Property Owners Association, testified that the Board arrived at the four hundred seventy-five-dollar ($475.00) fee following its review of the costs associated with security, trash collection, beach maintenance, and road maintenance apportioned to renters. Subsequent to the onset of this litigation, a letter dated March 11, 2016 was distributed to property owners stating that the rental registration fee was

enacted by the membership to improve the community and that the fee would assist in funding a storm water management program.

Mr. Millspaugh testified that he has continued to pay annual member fees to the Plaintiff and that he paid previous rental registration fees under protest until his refusal to pay in 2015. Eventually, he did pay the 2015 rental registration fee in order to provide his renters with beach access. The Defendants produced trial exhibits indicating that Mr. Millspaugh had sent an email and attached letter protesting payment of the rental registration fee to property managers in 2014, but there are no written documents for previous years. Mr. Millspaugh also testified that he does not believe the Plaintiff's actions constitute fraud, bad faith, or self-dealing, but that he disagrees with the enforcement of the rental registration fee as it stands. The Defendants' primary argument is that the rental registration fee as imposed by the Plaintiff is invalid under the Uniform Planned Community Act. 68 Pa. C.S.A. § 5101, et seq. The Plaintiff counters that the rental registration fee is valid and enforceable.

**ISSUE**

Is the rental registration fee imposed by Lake Harmony Estates Property Owners Association valid under the Uniform Planned Community Act?

## DISCUSSION

Under Pennsylvania law, the Uniform Planned Community Act hereinafter, ("the UPCA"), governs the regulation of planned communities. 68 Pa. C.S.A. § 5102. Section 5314 of the UPCA provides that all general common expenses must be assessed against all the units in accordance with the common expense liability allocated to each unit. 68 Pa. C.S.A. § 5314(b). Section 5314(c) also provides for special allocations of expenses, including the assessment of common expenses "benefiting fewer than all of the units" being assessed "exclusively against the units benefitted." 68 Pa. C.S.A. § 5314(c)(2). In relation to liens for assessments, a judgment or decree in any action or suit brought under Section 5315 of the UPCA shall include costs and reasonable attorney fees for the prevailing party. 68 Pa. C.S.A. § 5315(g).

The Plaintiff argues that Section 5314(c) applies in this case because the Property Owners Association has the authority to disparately allocate costs based on the use of the property, namely the higher costs associated with rental properties compared to non-rental properties. The Defendants argue that Section 5314(c) is inapplicable to this case because the rental registration fee is being used to pay for common expenses, such as security, trash collection, beach maintenance and road maintenance, which benefit all of the units rather than benefitting only the rental properties. Moreover, the Defendants claim that the payment of

such common expenses from the rental registration fees generated is contrary to the Plaintiff's stated purpose of imposing the fee which was to cover the costs associated with administering the rental program and printing informational materials.

We find that Section 5314(c) of the UPCA is not applicable here. Section 5314(b) of the UPCA provides that all common expenses of the association shall be assessed against all of the units in accordance with the common expense liability allocated to each unit in the case of general common expenses, with the exception of those assessments addressed in Section 5314(c). The exceptions set forth in Section 5314(c) do not address the facts at issue in the instant matter. The Plaintiff alleges that a portion of Section 5314(c) applies which is an exception providing that "any common expense benefitting fewer than all of the units shall be assessed exclusively against the units benefitted." The reliance on this section is misplaced. Initially, we note that the rental registration fees have been used towards common expenses including, but not limited to, security, trash collection, beach maintenance and road maintenance. We fail to see how these expenditures benefitted only those properties that were assessed a rental registration fee. Clearly, these common expenses do not benefit fewer than all of the units. Rather, they benefit all of the units and, as such, are general common expenses to be assessed against all the units. Moreover, these expenses have not been

assessed exclusively to rental units. Clearly, Section 5314(c)(2), is meant to address those instances where certain expenses would only benefit a limited number of units. That is not the case in the instant matters. The rental registration fees are being used by the Plaintiff to pay common expenses which benefit all units. This is not permitted pursuant to the Uniform Planned Community Act. Indeed, it appears that the Plaintiff did not allocate any portion of the rental registration fee to the cost of administering the rental program or printing informational materials which were the stated purposes for implementing the rental registration fee in 2005.

In reviewing the actions of the Plaintiff in establishing the rental registration fee, we find that the business judgment rule does not apply in this case. See Burgoyne v. Pinecrest Community Association, 924 A.2d 675, 682-83 (Pa. Super. 2007). Rather, it is Section 5303 of the UPCA which governs and the court must determine whether the Plaintiff's officers and board members acted "in good faith; in a manner they reasonably believe to be in the best interests of the association; and with care, including reasonable inquiry, skill and diligence as a person of ordinary prudence would use under similar circumstances." Burgoyne, 924 A.2d at 683 (*citing* 68 Pa. C.S.A. § 5303(a)). We cannot find, based upon the facts of these cases, that the Plaintiff failed to act in good faith or in a manner believed to be in the association's best interests,

particularly given the financial status of the association at the time of the rental registration fee increases. Moreover, we note that there are no claims against the Plaintiff's officers or board members for fraud, bad faith or self-dealing. We further note that one hundred percent of the monies generated from the rental registration fees were earmarked for the capital reserve fund, which is utilized for the preservation and maintenance of the association's long-term assets.[2] Nevertheless, we find that permitting the Plaintiff to retain the improperly assessed rental registration fees paid by the Defendants in these matters would be inequitable and result in the unjust enrichment of the Plaintiff.

Our decision in this matter should not be construed as a ruling which prohibits the Plaintiff from assessing a rental registration fee. Rather, we find that the current rental registration fee, as applied to the Defendants, is contrary to the express provisions of the UPCA and is, therefore, unenforceable as to said Defendants. The Plaintiff is free to assess a rental registration fee which addresses the actual costs of administration of a rental program to monitor rental units within Lake Harmony Estates or for other proper purposes in accordance with the Uniform Planned Community Act.

[2] The preservation and maintenance of Plaintiff's long-term assets are general common expenses of the association to be assessed appropriately under the UPCA.

## CONCLUSION

For the reasons stated hereinabove, we find that the rental registration fee, as applied to the Defendants herein, is contrary to the Uniform Planned Community Act and unenforceable against said Defendants. We will, therefore, enter the following

**IN THE COURT OF COMMON PLEAS OF CARBON COUNTY, PENNSYLVANIA**
**CIVIL DIVISION**

| | | |
|---|---|---|
| LAKE HARMONY ESTATES PROPERTY OWNERS ASSOCIATION, Plaintiff | : | No. 16-0472 (M4) |
| v. | : | No. 16-0473 (Ledgestone) |
| M4 HOLDINGS and LEDGESTONE PROPERTIES, LLC, Defendants | : | |

Aaron M. DeAngelo, Esquire — Counsel for Plaintiff

James R. Nanovic, Esquire — Counsel for Defendants

**VERDICT**

**AND NOW**, to wit, this 1st day of July, 2021, following a non-jury trial and our review of the post-trial submissions of counsel, and in accordance with our Memorandum Opinion bearing even date herewith, the Court hereby enters a verdict in favor of the Defendants, M4 Holdings and Ledgestone Properties, LLC, and against the Plaintiff, Lake Harmony Estates Property Owners Association, on the Plaintiff's complaint, and in favor of the Defendants, M4 Holdings and Ledgestone Properties, LLC, and against the Plaintiff, Lake Harmony Estates Property Owners Association, on the Defendants' counterclaim in the amount of eight thousand three hundred fifty dollars ($8,350.00).

Pursuant to 68 Pa. C.S.A. § 5315(g), the Plaintiff shall reimburse the Defendants' costs and attorney fees in the amount of fourteen thousand five hundred sixty-four dollars and eighty-five

cents ($14,564.85) within thirty (30) days following the entry of judgment herein.

**PURSUANT** to Pa.R.C.P. 227.4, the Prothonotary shall, upon praecipe, enter judgment on the verdict if no motion for post-trial relief has been filed under Pa.R.C.P. 227.1 within ten (10) days after notice of the filing of this decision.

**BY THE COURT:**

**Steven R. Serfass, J.**

Monroe County Prothonotary Filed February 05, 2026 4:10 PM

**COURT OF COMMON PLEAS OF MONROE COUNTY**
**FORTY-THIRD JUDICIAL DISTRICT**
**COMMONWEALTH OF PENNSYLVANIA**

| | |
|---|---|
| **MONET REILLY et al.,** | : **NO. 008215-CV-2022** |
| **Plaintiffs** | : |
| **vs.** | : |
| **ARROWHEAD LAKE COMMUNITY ASSOCIATION,** | : |
| **Defendant** | : **PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT** |

## OPINION

This case involves a request for declaratory relief concerning the regulation of short-term rentals, or vacation rentals, in a Planned Unit Development. Plaintiffs have filed a Motion for Summary Judgment seeking to have the regulation declared as void and unenforceable under the covenants for the Planned Unit Development known as Arrowhead Lake. Plaintiffs are the owners of lots/houses in the Arrowhead Lake Community located in Tobyhanna and Coolbaugh Townships, Monroe County, PA. The Arrowhead Lake Community is located within a geographic area known as the "Pocono Mountains." The Defendant, Arrowhead Lake Community Association ("Association") is the owner of common elements within the Arrowhead Lake community, including roads, lakes, recreational facilities and all common areas. The Association operates pursuant to covenants, bylaws and certain rules and regulations. All of the Plaintiffs are members of the Association by virtue of their ownership of a lot/home within the Arrowhead Lake Community. Plaintiffs initially sought injunctive relief,

monetary damages and declaratory relief. Hearings were first held on February 8, 2023 and February 13, 2023 on Plaintiffs' request for a preliminary injunction to prevent Defendant from enforcing a regulation regarding short-term rental use of Plaintiffs' properties. By Opinion and Order filed on March 2, 2023, the request for a preliminary injunction was denied. The parties have since engaged in discovery. The Plaintiffs who sought monetary damages have voluntarily withdrawn those claims. The sole remaining claim by Plaintiffs is a request for declaratory relief finding that the enacted short-term rental regulation is contrary to the covenants of Arrowhead Lake and is therefore void and unenforceable. Plaintiffs allege that any fees or regulation of properties for use as a rental must be approved by an amendment to the covenants by an affirmative vote of 67% of the members of the Association.

Plaintiff has moved for Summary Judgment on their claims for declaratory relief. Defendant has filed a response to the motion, and in the alternative, requests a finding that the short-term rental regulation does not violate the covenants. Defendant asserts that the Association's Board acted in good faith and in a manner permitted by the covenants and bylaws of Arrowhead Lake and pursuant to the Uniform Planned Community Act ("UPCA") of 68 Pa. C.S.A. Section 5101 et seq. in enacting the short-term rental policy. Defendant has not filed a separate motion for summary judgment. However, we consider the Defendant's Response to Plaintiffs' Motion to be a request for judgment in its favor. The parties agree on the relevant facts of this case and to the documents at issue. They just do not agree on the interpretation of those documents. Therefore, this court accepts that both parties are seeking a final order of court based upon Plaintiffs' Motion for Summary Judgment, Defendant's Response thereto, the underlying request of the Plaintiffs for Declaratory Relief, and the relevant facts and documents that are not in dispute.

## FACTUAL BACKGROUND

Plaintiffs are owners of lots/homes in the Arrowhead Lake Community. Arrowhead Lake is private community consisting of approximately 2466 lots, roads, lakes, recreational facilities and other common areas. The original developer was All-American Realty Co., Inc. ("All American"), who started developing and selling lots in the 1960's. Deeded restrictive covenants were recorded with individual property deeds when All-American sold lots. *See* Plaintiffs' Complaint, Exhibit A, B, C and D, attached to Plaintiffs' Motion for Summary Judgment as Exh. 1. Those covenants run with the land in all successor deeds.

In or about 1984, All-American defaulted on terms of a loan with a local lender. All remaining lots were transferred to a holding company formed by that lender, which was called Benasa Realty Co.[1] At or prior to that time, the Association was formed and the common elements of Arrowhead Lake comprising the roads, lakes, recreational facilities and all common areas were transferred to the Association. The deeded restrictive covenants to the properties conveyed by All-American to lot owners contained language that all lot owners were members of the Arrowhead Lake Country Club, Inc., which would manage the common elements. The deeded restrictive covenants also stated that all guests and family members of owners had to be approved as "honorary members" of Arrowhead Lake Country Club, Inc. Id. It is unknown if Arrowhead Lake Country Club, Inc. was ever formed by the developer, All American, or was in actual operation. However, by the time Benasa Realty Co. took title to all remaining lots of All-American in 1984, the common elements had been transferred to the newly formed Association.

A "Declaration of Easement" between Benasa Realty Co. and the Association was recorded at the Monroe County Recorder of Deeds Office in Deed Book 1382 page 268 in or

[1] The court takes judicial notice of these facts from courthouse records. *See* also Declaration of Easement attached to Plaintiffs' Complaint as Exh. E and to Plaintiffs' Motion for Summary Judgment as Exh. 1

about 1984. *See* Plaintiffs' Complaint Exh. E, attached to Plaintiffs' Motion for Summary Judgment as Exh. 1. The Declaration of Easement had attached thereto restrictive covenants ("1984 Declaration of Covenants") that were to apply to all lots in Arrowhead Lake that were conveyed to Benasa Realty Co. The 1984 Declaration of Covenants have not been amended. The 1984 Declaration of Covenants contained most of the same covenants as the deeded restrictive covenants conveyed by All-American, but with a few exceptions. Most notably, the references to the "Developer" or to "Arrowhead Lake Country Club, Inc." in the deeded restrictions were replaced by the "Association;" and, updated and additional language concerning annual assessments, use of the common elements, and powers of the Association were added.

The Association subsequently adopted bylaws, of which the most recent version was last revised on November 8, 2014. *See* Defendant's Response to Motion for Summary Judgment Exh. B. The Association's Board of Directors adopted Rules and Regulations, of which the most recent version was last revised on January 1, 2023. *See* Defendant's Response to Motion for Summary Judgment, Exh. C.

The parties agree that the Association has enacted policies and/or rules and regulations in the past concerning the rental of properties in Arrowhead Lake by property owners. On December 3, 2022, the Board of Directors of the Association enacted a new policy, effective January 1, 2023, regarding short-term rentals, or vacation rentals. *See* Plaintiffs' Complaint Exh. F attached to Plaintiffs' Motion for Summary Judgment Exh. 1. That short-term rental policy was the initial subject of Plaintiffs' suit that was filed in this matter.

On or about April 15, 2024, the Board of Directors of the Association adopted a slightly revised short-term rental policy. *See* Plaintiff's Motion for Summary Judgment Exh. 2. Plaintiffs seek declaratory relief that Defendant cannot enact any short-term rental policy without

a change to the covenants. *See* Plaintiff's Motion for Summary Judgment Exh. 2. To amend or change covenants requires the approval of 67% of the owners under the U.P.C.A.

**DISCUSSION**

Plaintiffs seek a declaration from this court finding that the Association's short-term rental policy is void and unenforceable. Plaintiffs' position is that any short-term rental policy, rule, regulation or bylaw would violate the 1984 Declaration of Covenants and the prior deeded restrictive covenants, and can only be done by an amendment to the covenants. Plaintiffs assert that the rental of properties is freely allowed under the covenants without additional requirements or fees as the Association can only charge the same yearly assessment to all lot owners as necessary to cover the expenses of maintaining, protecting and operating the recreational facilities and roads in Arrowhead Lake, and nothing more.

The Association counters that nothing in the deeded restrictive covenants nor in the 1984 Declaration of Covenants prohibits the regulation of short-term rentals by the Association. To the contrary, the Association views the covenants as specifically allowing it to regulate properties being rented in Arrowhead Lake. The Association argues that the declaratory relief sought by Plaintiffs should be denied.

The Declaratory Judgment Act provides that "[a]ny person interested under a deed, will, written contract, or other writings constituting a contract . . . may have determined any question of construction or validity arising under the instrument . . . and obtain a declaration of rights, status or other legal relations thereunder." 42 Pa. C.S.A. Section 7533. The court can make declarations as to the parties' rights and status, either affirmatively or negatively in form and effect, and such declarations shall have the force and effects of a final judgment or decree. 42 Pa. C.S.A. Section 7532.

Summary judgment is appropriate at the close of pleadings, when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Pa. R.C.P. 1035.2; Ertle v. Patriot News Co., 674 A.2d 1038 (Pa. 1996). In this case, the court is treating Plaintiffs' Motion for Summary Judgment as a final determination on the declaratory relief requested by Plaintiffs. We find authorization for this in the Declaratory Judgment Act and the Motion of Plaintiffs and the Response of the Defendant.

A. Association Covenants and Deed Restrictions –

The deeded restrictive covenants referenced by Plaintiffs and the 1984 Declaration of Covenants differ somewhat. *See* Plaintiffs' Complaint Exh. A, B, C, D and E attached to Plaintiffs' Motion for Summary Judgment Exh. 1. Without going through all of the differences, we note relevant ones acknowledged by the Plaintiffs that are contained in the deeded restrictive covenants, but are not contained in the 1984 Declaration of Covenants, as follows:

> "It is covenanted and agreed . . . that no part or portion of the above-described premises shall be owned, used or occupied . . . by any person or persons unless such person or persons shall first be approved for membership in Arrowhead Lake Country Club, Inc."

Id. at Exh. A, B, C, D.

> "Nor will any grantees sell, convey, rent, lease or permit to be occupied . . . by any person or persons, excepting those first approved for membership in Arrowhead Lake Country Club, Inc. and will submit the required application to said club, and obtain approval thereof before any sale, conveyance, lease or rental is consummated, or occupancy is permitted."

Id.

"The lakes shall be used by no one who is not an owner of a plot at Arrowhead Lake, or a guest or member of the family of such owner provided they first shall be approved for honorary membership in Arrowhead Lake Country Club, Inc."

Id. Note: this is the same language as in the 1984 Declaration of Covenants paragraph 6 except that Arrowhead Lake Country Club, Inc. is later replaced by Arrowhead Lake Community Association.

Plaintiffs also acknowledge that the 1984 Declaration of Covenants provides for an annual assessment that is more than in the deeded restrictive covenants, includes a method of increasing yearly assessments tied to an increase in costs or an increase in benefits for lot owners each year, and calls for capital improvement assessments. There were other additional provisions contained in the 1984 Declaration of Covenants that were not in the deeded restrictive covenants, of which the relevant ones will be discussed later.

A planned community declaration is the equivalent of a contract between members of an association and the association itself. Wrenfield Homeowners Assoc. v. DeYoung, 600 A.2d 960 (Pa. S. 1991). Deed restrictions are no different. *See* Starling v. Lake Meade Prop. Owners Ass'n., Inc., 162 A.3d 327 (Pa. 2017); Hankin v. Goodman, 246 A.2d 658 (Pa. 1968); Goldberg v. Nicola, 178 A. 809 (Pa. 1935).

We find that the deeded restrictive covenants of certain Plaintiffs' chains of title and for others in Arrowhead Lake as set forth in Plaintiffs' Complaint at Exh. A, B, C and D are enforceable, unless it is impossible to enforce. Plaintiffs and other owners in Arrowhead Lake who purchased properties out of the Benasa Realty Co. chain of title, after All-American transferred the remaining lots to Benasa, and after roads and common elements were transferred

to the Association, are subject to the 1984 Declaration of Covenants.[2] Those covenants are also enforceable.

The reference in the deeded restrictive covenants of owners needing approval for membership in Arrowhead Lake Country Club, Inc. is impossible because the Arrowhead Lake Country Club, Inc. no longer exists. Likewise, the requirement that any grantees who sell, convey, rent, lease or permit to be occupied, must also be approved for membership in Arrowhead Lake Country Club, Inc. is also impossible. Finally, the restrictive covenants requiring that the lakes be used by no one who is not an owner or a guest or family member of the owner unless approved for membership in Arrowhead Lake Country Club, Inc. are also impossible. However, the impossibility only applies to being approved by the Arrowhead Lake Country Club, Inc. since it does not exist.

The Association is the successor to Arrowhead Lake Country Club, Inc. The common elements were conveyed to the Association, the Association has been operating for the benefit of the lot owners, and the Association has been and continues to maintain, protect and operate the common elements and the roads in Arrowhead Lake. This was undisputed by the parties. Therefore, for purposes of their membership in the Arrowhead Lake Country Club, Inc. referenced in certain lot owners' chains of title, their membership is now in the Association, who has assumed that role. The requirement and duties imposed in certain lot owner' chains of title by the deeded restrictive covenants is now owed to and performed by the Association. The change in the entity does not void any of the requirements or other language of the deeded

[2] The separation into two qualifying sets of properties, one governed by deed restrictions and one governed by the 1984 Declaration of Covenants is unavoidable. The transfer of remaining lots and transfer of common elements referenced in the 1984 Declaration of Easement specifically states that the 1984 Declaration of Easement applies to lots transferred to Benasa by All-American. There was no provision therein that it applies to lots previously sold by All-American. The parties have not fully addressed this as an issue, if any.

restrictive covenants of Exh. A, B, C and D in Plaintiffs' Complaint. We will look at both the deeded restrictive covenants applicable in Arrowhead Lake and the 1984 Declaration of Covenants in determining applicability of the Association's short-term rental policy.

B. Prior rental policies in Arrowhead Lake –

Plaintiffs and Defendant have both referenced that rental regulations have existed in Arrowhead Lake prior to the short-term rental policy at issue. Neither party has specifically argued that a failure to challenge prior rental policies is a waiver to challenge it now. We address it nonetheless and find that the deeded restrictive covenants and the 1984 Declaration of Covenants provide for a non-waiver of rights to enforce restrictions, conditions or covenants at anytime. We also find that prior rental policies are irrelevant to the current request for declaratory relief.

C. Association's Short-Term Rental Policy –

Plaintiffs argue that the deeded restrictive covenants and the 1984 Declaration of Covenants do not allow for the imposition of the short-term rental policy. Plaintiffs argue the plain language of the covenants bars restrictions on the renting of properties, that the covenants do not provide for regulations on the use of properties, and that the Association is limited to charging only for common areas and road expenses as part of annual assessments. The Association counters that the covenants do allow restrictions on the renting of properties, including short-term rentals, that the covenants do provide for regulation of the use of properties, and that the Association is allowed to charge fees outside of the annual assessments made for common elements and roads. We must interpret the different covenants at issue here to make a determination as to the claims of both parties.

Restrictive covenants are limitations on a person's free and unconstrained use of property. Richman v. Mosites, 704 A.2d 655 (Pa. Super. 1997). They are not favored by the law, but are legally enforceable. Logston v. Penndale, Inc., 576 A.2d 59 (Pa. Super. 1990). Restrictive covenants are to be strictly construed against the person seeking to enforce and in favor of free and unrestricted use of property. Baumgardner v. Stuckey, 735 A.2d 1272 (Pa. Super. 1999). A court must rely on the ordinary meaning of the language in restrictive covenants and cannot enlarge by implication a restraint on the use of land. Berger v. Ackerman, 439 A.2d 200 (Pa. Super. 1981).

When words of an agreement are clear and unambiguous, the intent of the parties is to be ascertained from the language used in the agreement. LJL Transportation, Inc. v. Pilot Air Freight Corp., 962 A.2d 639 (Pa. 2009). Where a "covenant is unambiguous, review by a court is limited to the confines of the covenant." Richman, supra. Where there is ambiguity in the restrictive covenant's language, it is to be resolved in favor of the owner of land. Jones v. Park Lane for Convalescents, 120 A.2d 535 (Pa. 1956). To ascertain the intent of parties in a restrictive covenant, the covenant must be construed in light of: 1) the language therein; 2) the nature of the subject matter; 3) the apparent object or purpose of the parties; and 4) the circumstances or conditions surrounding the execution of the covenants. Vernon Twp. Vol. Fire Dept. Inc. v. Connors, 855 A.2d 873 (Pa. 2004).

Plaintiffs argue that the short-term rental policy places restrictions on owners' properties that are not permitted by the covenants and are therefore unenforceable without an amendment to the covenants. As Plaintiffs and Defendant note, the restrictive covenants do not directly reference rental properties or short-term rentals. But, the covenants generally provide the right of owners to rent properties in Arrowhead Lake.

In the deed restrictions, there is a provision that before grantees (owners) sell, convey, rent, lease or permit the premises to be occupied by others, they must first be approved for membership in Arrowhead Lake Country Club Inc. and obtain approval thereof before any sale, conveyance, lease or rental is consummated or occupancy is permitted. (emphasis added). *See* Plaintiffs' Complaint Exh. A, B, C, D attached to Plaintiffs' Motion for Summary Judgment Exh. 1. The language of the deeded restrictive covenants certainly provides the right for owners to rent properties, provided they obtain approval from Arrowhead Lake Country Club, Inc. By successor thereto, that entity is now the Association.

The 1984 Declaration of Covenants also contemplates rentals by owners of property in Arrowhead Lake. Paragraph 6 of the covenants provides that no one is permitted to use the lakes who are not an owner or a guest or member of the family, provided they shall first be approved for honorary membership in the Association. (emphasis added). Id. at Exh. "E." Paragraph 12(b) of the covenants also contemplates the rental of property in that each lot owner, assign, guests or members of the owner's family are subject to approval for the use of the beach or recreational areas, subject to rules and regulations of the Association. (emphasis added). Id.

The term "guest" and "assign" are generic terms that can mean someone with permission of the owner to be there. This language can commonly include renters at the owners' properties. As such, we find the language of the covenants provides a clear right for owners to rent their properties.

However, such a right is not unqualified and the covenants do provide a means for the Association to regulate rentals within Arrowhead Lake, including the imposition of the short-term rental policy that has been enacted. First, both the deeded restrictive covenants and the 1984 Declaration of Covenants generally allow for regulation of the use of the properties for

single-family residential purposes. Both the deeded restrictions and the 1984 Declaration of Covenants state in the first paragraph that all lots shall be reserved and used for single-family residential purposes exclusively (emphasis added). Id. at Exh. A, B, C, D and E.

We find this language permits the regulation of the use of lots in Arrowhead Lake by the Association. Restrictive covenants fall into two categories: building and use restrictions. *See* Jones v. Park Lane for Convalescents, supra. Building restrictions concern the physical aspect or external appearance of the building. Id. Use restrictions involve the purposes for which the buildings are used, the nature of the occupancy and the operations conducted therein Id. A restrictive covenant can manifest an intention to restrict both construction and use. Id. To create a use restriction, the language must squarely address the use or manner of occupation of the property. Groninger v. Aumiller, 644 A.2d 1266 (Pa. Super. 1994).

In this case, the language of the covenants clearly limits not just the construction, but also the use of properties for single-family residential purposes. This implies normal uses as a single-family home. Short-term rentals have been held to be a purely transient use of a dwelling and would not normally be a permitted use where limited to single-family homes. *See* Slice of Life LLC v. Hamilton Twp. Z.H.B., 207 A.3d 886 (Pa. 2019). While the Slice of Life case dealt with the interpretation of a zoning ordinance, the finding therein that a short-term rental was not compatible with a single-family use restriction is instructive. Absent some permissive reason, it is not an allowed use, even though a long-term rental, for thirty (30) days or more, would be allowed where limited to single-family homes. Therefore, while Plaintiffs have an ultimate right to rent their properties under the bylaws, the specific use as a short-term rental can be regulated by the Association if it wants to allow such rentals, by the implication of that language limiting use to single-family homes.

Plaintiffs have cited the case of Chan v. Ass'n. of Property Owners of the Hideout, Inc., 323 A.3d 92 (Pa. Cmwlth. 2024), app. denied 333 A.3d 1250 (Pa. 2024) as binding authority to allow short-term rentals without regulations and fees. However, the Hideout case is distinguishable from the facts at Arrowhead Lake. Both involve the regulation of short-term rentals. Both involve the right to rent properties as provided for in the covenants. However, in the Hideout case, the holding was limited to a finding that the Declaration of Covenants did not contain language regarding use restrictions. Instead, the covenants noted that no improvement was permitted except a single-family dwelling. This restriction solely pertained to the building and construction of the homes. The court found there was no language about the use of the homes. The narrow holding was limited to the lack of any use restrictions, and in light of the right to rent properties, the bylaw containing restrictions on short-term rentals was unenforceable without an amendment to the covenants. Id. Here, there is a use restriction limiting all lots to be used for single-family residential purposes, and not just the construction of single-family homes. Therefore, the holding in the Hideout case does not apply here, and the Association can regulate use under the covenants.

Furthermore, in addition to the language in the deeded restrictive covenants and the 1984 Declaration of Covenants regarding a reservation that all lots be used for single-family residential purposes exclusively, there is other language in the covenants permitting the short-term rental policy. All of the covenants state that guests' use of the lake requires that they be approved for honorary membership in the Association.[3] The covenants also state that no part or portion of the lots shall be used or occupied unless first approved by the Association. The language of the covenants also requires approval from the Association to use of the lake. There

[3] For lot owners subject only to the deeded restrictive covenants, it states the Arrowhead Lake Country Club, Inc., which is now by successor thereto, the Association.

is no restriction or limitation on what is required in order to be approved by the Association. If the Association can approve use and occupancy, it an decide how that approval is given. The language requiring membership approval is unambiguous. The Association can determine what is required for approval, as the covenants place no limits thereon.

The covenants also provide for the use of beach facilities. Again, the covenants provide that all owners, guests and family members must be approved for membership in the Association. In paragraph 12 of the pre-1984 deeded restrictive covenants, the owners, guests and family members must comply with rules and regulations as promulgated from time to time by the Association, as the successor to the common facilities, for certain uses. Id. at Exh. A, B, C, D. The 1984 Declaration of Covenants goes one step further and states that all owners', assigns', guests' and family members' use of beaches or recreational areas are subject to approval of the Association, that charges can be incurred, and that there be compliance with rules and regulations of the Association. Id. at Exh. E. para. 12.

Finally, in the 1984 Declaration of Covenants, the Association is required to maintain the beaches, roads and common use facilities, while having the right to deny use thereof for violation of rules and regulations. Id. In short, all of the covenants applicable to Arrowhead Lake impose restrictions on use. This permits the Association to adopt policies as to the use of properties, including rentals, and by extension, short-term rentals. The Association's ability under the covenants to limit use to single-family residential purposes, to approve owners, guests and family members for membership and honorary membership in the Association and for use of common elements, and from the express language allowing the Association to promulgate rules and regulations as to uses, allows the Association to adopt the short-term rental policy. It is not contrary to the covenants, and is therefore enforceable.

Plaintiffs also argue that the short-term rental policy requires the payment of fees not set forth in the covenants. Plaintiffs assert the only mandated fee to be collected pursuant to the covenants is for an annual assessment that is to be charged the same to all owners for the expense of maintaining, protecting and operating the recreational facilities and the roads. Plaintiffs assert there is no authorization in the covenants to charge additional fees against those owners engaged in short-term rentals. However, as stated above, the covenants do not limit the Association to only collecting annual assessments. The covenants also provide for guests to be approved for honorary membership. How that approval process is done is up to the Association as the covenants are silent. The covenants also allow for additional fees to be charged for use of the beaches and that rules and regulations as to the use of the beaches and other recreational facilities can be established by the Association. This general language grants broad power to the Association. While the covenants provide for a general annual assessment intended to cover the expenses of maintaining, protecting and operating the recreational facilities and the roads in Arrowhead Lake, the covenants do not state that this is the only charge that can be assessed by the Association.

A homeowners association may be viewed as a "miniature government." Hess v. Barton Glen Club, Inc., 718 A.2d 908 (Pa. Cmwlth. 1998). An association has broad powers to enact regulations and assessments. Fogarty v. Hemlock Farms Community Assoc., 685 A.2d 241 (Pa. Cmwlth. 1996). The UPCA also permits the exercise of broad powers for the Association to perform necessary and proper governance. 68 Pa. C.S.A. Section 5302 (a)(2); (16). Here, the language of the covenants gives broad power to the Association to regulate the use of properties by owners for single-family homes, and the use of the common elements. This implies an ability to regulate short-term rentals, as well as other rental terms. For all of the

reasons stated herein, the short-term rental policy is not prohibited by the covenants. It is enforceable without the covenants having to be amended. Plaintiffs' Motion for Summary Judgment will be denied, and an order will be entered denying Plaintiffs' request for declaratory relief.

**COURT OF COMMON PLEAS OF MONROE COUNTY**
**FORTY-THIRD JUDICIAL DISTRICT**
**COMMONWEALTH OF PENNSYLVANIA**

| | |
|---|---|
| **MONET REILLY et al.,** | : **NO. 008215-CV-2022** |
| **Plaintiffs** | : |
| **vs.** | : |
| **ARROWHEAD LAKE COMMUNITY ASSOCIATION,** | : |
| **Defendant** | : **PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT** |

**<u>O R D E R</u>**

**AND NOW,** this 5th day of February, 2026, Plaintiffs' Motion for Summary Judgment is DENIED. It is further ordered as follows:

1. Defendant's short-term rental policy does not violate the covenants applicable to lot owners in Arrowhead Lake, and the policy is enforceable as to Plaintiffs and all lot owners.

2. The covenants do not need to be amended in order for Defendant's short-term rental policy to take effect. The policy is effective as to all lot owners in Arrowhead Lake.

3. Plaintiffs' request for Declaratory relief is DENIED.

**BY THE COURT:**

**DAVID J. WILLIAMSON, J.**

cc: James L. Pearl, Esquire
Paul C. Troy, Esquire
Thomas J. Zimmerman, Esquire

DJW2026-007 Reilly v Arrowhead Lake 8215 CV 2022.docx

2023 WL 2163975
Only the Westlaw citation is currently available.
United States District Court, E.D. Pennsylvania.

Kristina TRAVIS, individually and on behalf of all others similarly situated,
v.
STATE AUTO MUTUAL INSURANCE COMPANY, INC., d/b/a State Auto Insurance Companies, et al.

CIVIL ACTION NO. 21-5395
|
Filed February 22, 2023

**Attorneys and Law Firms**

Kenneth J. Grunfeld, Kevin William Fay, Golomb Spirt Grunfeld, P.C., Philadelphia, PA, for Kristina Travis.

James Gaughan, Riley, Safer, Holmes & Cancila LLP, Chicago, IL, Vlada Tasich, Marshall Dennehey Warner Coleman & Goggin, Philadelphia, PA, for State Automobile Mutual Insurance Company, Inc., Milbank Insurance Company.

**MEMORANDUM OPINION**

Schmehl, District Judge

**I. INTRODUCTION**

***1** Before the Court is the motion of Defendants, State Automobile Mutual Insurance Company ("State Auto") and Milbank Insurance Company ("Milbank") (collectively referred to as "Defendants") to dismiss the Amended Class Action Complaint filed by Plaintiff, Kristina Travis ("Plaintiff" or "Travis"). Travis filed an Amended Complaint seeking relief for alleged violations of RICO, breach of contract, violations of the Pennsylvania Unfair Trade Practices and Consumer Protection Law, and fraud, as well as several other state law causes of action. Based upon the parties' submissions, Defendants' motion will be granted in part and denied in part.

**II. BACKGROUND**

In July 2019, Travis, through her broker, purchased thirteen Dwelling Fire insurance policies from Milbank to cover properties that she owned (hereinafter the "Policy" or "Policies"). (Am. Compl., ¶¶55, 89, 95, 101.) The coverage provisions of the Policy are set forth in the section of the Policy entitled "Dwelling Property 2 – Broad Form" and apply to the location described in the Policy. Coverages A, B, D, and E of the Policy provide coverage for Dwelling, Other Structures, Fair Rental Value, and Additional Living Expense, respectively. (Am Compl., Ex. C, p. 18). Section F ("Other Coverages") describes additional coverages. Sections F.1 (Other Structures) provides that: "You may use up to 10% of the Coverage A limit of liability for loss by a Peril Insured Against to other structures described in Coverage B," and F.5 (Rental Value and Additional Living Expense) provides that: "You may use up to 20% of the Coverage A limit of liability for loss of both fair rental value as described in Coverage D and additional living expense as described in Coverage E." (*Id.*, Ex. C, pp 19-20.) Travis claims that Defendants maintained a policy to "cap" the coverage for Sections B, D, and E in the amounts included in Section A (10% for B and 20% for D and E) (Am. Compl., ¶53).

Travis asserts that Defendants developed a "scheme" designed "to trick unsuspecting consumers and their brokers into purchasing lines of phantom insurance within Dwelling Fire policies, which caused the Plaintiff policyholders to pay for coverage that was already included with the policy." (Am. Compl., ¶1.) Travis alleges that the scheme began in 2015 and involved misrepresentations communicated through Defendants' website portal and on the Declaration Page of each Dwelling Fire Policy. (*Id.*, ¶2.) She claims the scheme ended in July 2021, when State Auto updated the Connect Platform and issued revised Declaration Pages. (*Id.*, ¶9.)

Travis alleges that she and her broker were "duped" into purchasing worthless Section B, D, and E coverage through the Connect Platform. (Am. Compl., ¶¶55, 87-88, 93-94, 99-100.) She claims that the quote screen was misleading because it did not remind the broker that 10% of the Section A Dwelling coverage was available for Section B Other Structures coverage, or that 20% of the Section A Dwelling coverage was available for Sections D & E Fair Rental Value and Additional Living Expense coverage. (Am. Compl., ¶41.) Travis also alleges that the quote screen conveyed the message that if one wants his or her Dwelling Fire policy to contain Sections B, D, and E coverage, "then he or she must check the box next to these lines in order to make sure they are included." (Am. Compl., ¶42.) Travis claims that "[t]he consequence of selecting the above check boxes for Sections B, D, & E coverage was that the total cost of the premium on the policy would increase, although in reality, there would be no corresponding increase in coverage," and that "[p]olicyholders were paying extra for coverage they were already entitled to." (*Id.*, ¶¶43-44.)

***2** Travis alleges that beginning July 2, 2021, State Auto began disclosing on the Connect Platform that 10% of Coverage A is included for Coverage B Other Structures and 20% of Coverage A is included for Coverage D Fair Rental Value, and that sometime after July 2, 2021, the Declarations Pages on each policy were modified to provide additional disclosures about the Sections B, D & E coverages that were included with the purchase of Section A. (Am. Compl., ¶¶81, 83.) Travis claims that Defendants' acts of changing their policies and adding disclosures in July 2021 amounts to an admission that the B, D, and E check boxes never belonged on the Connect Platform in the first place and that each Declarations Page should have always included disclosures that the B, D, and E coverage comes with the purchase of A coverage. (*Id.*, ¶75.) Plaintiff also alleges that beginning on July 2, 2021, State Auto began disclosing that additional limits can be purchased for both B and D and thereby "functionally eliminated the Cap Policy in order to cover up its scheme." (*Id.*, ¶82.)

## III. LEGAL STANDARD

Federal Rule of Civil Procedure 12(b)(6) governs the Court's motion to dismiss analysis. "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim of relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (*quoting Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim satisfies the plausibility standard when the facts alleged "allow[ ] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Burtch v. Millberg Factors, Inc.*, 662 F.3d 212, 220-21 (3d Cir. 2011) (*citing Iqbal*, 556 U.S. at 678). While the plausibility standard is not "akin to a 'probability requirement,' " there nevertheless must be more than a "sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (*citing Twombly*, 550 U.S. at 556). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.' " *Id.* (*quoting Twombly*, 550 U.S. at 557).

The Court of Appeals requires us to apply a three-step analysis to a 12(b)(6) motion: (1) "[i]t must 'tak[e] note of the elements [the] plaintiff must plead to state a claim;' " (2) "it should identify allegations that, 'because they are no more than conclusions, are not entitled to the assumption of truth;' " and, (3) "[w]hen there are well-pleaded factual allegations, [the] court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief." *Connelly v. Lane Construction Corp.*, 809 F.3d 780, 787 (3d Cir. 2016) (*quoting Iqbal*, 556 U.S. at 675, 679). *See Burtch*, 662 F.3d at 221; *Malleus v. George*, 641 F.3d 560, 563 (3d Cir. 2011); *Santiago v. Warminster Township*, 629 F.3d 121, 130 (3d Cir. 2010).

In our analysis of a motion to dismiss, the Court of Appeals allows us to also consider documents "attached to or submitted with the complaint, and any 'matters incorporated by reference or integral to the claim, items subject to judicial notice, matters

of public record, orders, [and] items appearing in the record of the case.' " *Buck v. Hampton Tp. School Dist.*, 452 F.3d 256, 260 (3d Cir. 2006) (quoting 5B Charles A. Wright & Arthur R. Miller, Federal Practice & Procedure § 1357 (3d ed. 2004)).

## IV. DISCUSSION

### A. RICO Claims

Counts I and II of Plaintiff's Amended Complaint contain claims against State Auto and ten Jane Doe defendants under Sections 1962(c) and 1962(d) of RICO. Section 1962(c) of the Racketeer Influenced and Corrupt Organizations Act (RICO) prohibits "any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." 18 U.S.C. § 1962(c). To state a claim for RICO under 1962(c), a plaintiff must plead "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity, plus an injury to 'business or property.' " *In re Ins. Brokerage Antitrust Litig.*, 579 F.3d 241, 269 (3d Cir. 2009) (citations omitted).

***3** Here, Travis alleges in Count I that State Auto violated Section 1962(c) when it "exercised discretion on behalf of Milbank by creating, overseeing, and controlling the Connect Platform, which was the primary mechanism for stealing additional premiums from policyholders," and that it "therefore has a role in directing the affairs of Milbank and/or one or more of the JANE DOE Defendants." (Am. Compl., ¶124.) Through "numerous acts of mail and wire fraud," State Auto and the Jane Doe Defendants allegedly "conducted or participated in the conduct of the affairs of Milbank and/or one or more of the JANE DOE Defendants through a pattern of racketeering activity" which "directly and proximately injured the business and property of Plaintiff and the Class." (Am. Compl., ¶¶126, 128.) Count II alleges that State Auto and the Jane Does are associated with Milbank and agreed and conspired to engage in the alleged pattern of mail and wire fraud in violation of Section 1962(d) of RICO. (*Id.*, ¶133.)

Upon close review of Travis' RICO allegations, I find that her RICO claims must be dismissed because she cannot plead a proper RICO enterprise. A RICO " 'enterprise' includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). Travis alleges that "Milbank and/or one of more of the JANE DOE Defendants are legal entities that together form an association-in-fact enterprise joined for the purpose of selling, marketing, and administering Dwelling Fire insurance policies through the Connect Platform." (Am. Compl., ¶123.) Travis seeks to impose liability on State Auto and the Jane Does as the "persons" who conducted or participated in the affairs of the "enterprise." (*See id.*, ¶126.)

In order to establish a RICO enterprise under Section 1962(c), Travis is required to demonstrate: "(1) that the enterprise consisted of 'a group of persons associated together for a common purpose of engaging in a course of conduct,' (2) that there was 'evidence of an ongoing organization, formal or informal;' (3) that there was 'evidence that the various associates function[ed] as a continuing unit;' and (4) that the defendant was separate and distinct from (instead of identical to) the purported enterprise." *Kennedy v. Equifax, Inc.*, 2019 WL 1382649, at *3 (E.D. Pa. March 27, 2019), citing *United States v. Turkette*, 452 U.S. 576, 583 (1981) and *United States v. Goldin Indus., Inc.*, 219 F.3d 1268, 1270 (11th Cir. 2000).

The instant RICO claims can be disposed of by examining the requirement that the defendant be separate and distinct from the enterprise. To satisfy this distinctiveness requirement for a RICO enterprise, "a plaintiff must allege ... the existence of two distinct entities: (1) a 'person' [who operates or manages the enterprise]; and (2) an 'enterprise' that is not simply the same 'person' referred to by a different name." *Mega Concrete, Inc. v. Smith*, 2013 WL 3716515, at *12 (E.D. Pa. July 15, 2013) (*citing Cedric Kushner Promotions, Ltd. V. King*, 533 U.S. 158, 161 (2001)) (internal quotations omitted). Importantly, courts in this circuit have held that a "corporation is not distinct from its subsidiaries, relatives, agents, and affiliates for the purposes of § 1962(c)." *Blue Cross Blue Shield Association v. GlaxoSmithKline LLC*, 417 F. Supp. 3d 531, 562 (E.D. Pa. Sept. 30, 2019) (internal citation and quotation marks committed). "A RICO claim under section 1962(c) is not stated where the subsidiary merely acts on behalf of, or to the benefit of, its parent." *Lorenz v. CSX Corp.*, 1 F.3d 1406, 1412 (3d Cir. 1993). A corporation generally "cannot be a defendant under section 1962(c) for conducting an 'enterprise' consisting of its own subsidiaries ... or

consisting of the corporation itself in association with its subsidiaries or employees." *Gasoline Sales, Inc. v. Aero Oil Co.*, 39 F.3d 70, 73 (3d Cir. 1994), citing *Brittingham v. Mobil Corp.*, 943 F.2d 297, 302-303 (3d Cir. 1991). A rare exception exists to this rule when there are allegations that the defendant corporation "had a role in the racketeering activity that was distinct from the undertakings of those acting on its behalf." *Id.*, citing *Brittingham*, 943 F.2d at 302; *Glessner v. Kenny*, 952 F.2d 702, 712 (3d Cir. 1991); *Lorenz*, 1 F.3d at 1413 n. 4.

***4** In the instant matter, Travis alleges that the "person" who operated the enterprise is State Auto and that the "enterprise" consists of Milbank and the Jane Doe defendants. Travis fails to allege that State Auto played a distinctive and separate role in the racketeering activity, and in fact, cannot do so, as Milbank is a subsidiary of State Auto. (Am. Compl., ¶22.) The same analysis holds true for the Jane Doe defendants who are alleged to be part of the enterprise, as they are all employees of State Auto. (Am. Compl., ¶¶23-24.) There is no third-party member alleged outside the sphere of State Auto that would create distinctiveness. The alleged enterprise consists solely of State Auto's subsidiary and/or its employees. Therefore, State Auto is clearly not distinct from the "enterprise" allegedly formed by Milbank and the Jane Does to have conducted said enterprise within the meaning of Section 1962(c). Further, there are no allegations that State Auto had a "role in the racketeering activity that was distinct from the undertakings of those acting on its behalf," and therefore, the exception does not apply. Accordingly, Count I of the Amended Complaint is dismissed[1].

Travis alleges in Count II of her Amended Complaint that State Auto and the Jane Doe defendants agreed and conspired to engage in mail and wire fraud in violation of 1962(d). Under section 1962(d), "[i]t shall be unlawful for any person to conspire to violate any of the provisions of subsections (a), (b), or (c) of this section." Therefore, it follows that "[a]ny claim under section 1962(d) based on a conspiracy to violate the other subsections of section 1962 must fail if the substantive claims themselves are deficient." *Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1191 (3d Cir. 1993). As Travis' claim under section 1962(c) must fail, as discussed above, it follows that the Amended Complaint also fails to allege a conspiracy under § 1962(d). Accordingly, Count II of the Amended Complaint is dismissed.

### B. Breach of Contract and Covenant of Good Faith and Fair Dealing

To establish a breach of contract claim under Pennsylvania law, a party must show "(1) the existence of a contract, including its essential terms, (2) a breach of a duty imposed by the contract, and (3) resultant damages." *Ware v. Rodale Press, Inc.*, 322 F.3d 218, 225 (3d Cir. 2003). In the instant matter, Defendants argue that Travis' contract claims must fail because she is unable to point to a contractual duty that was breached by Defendants, or to any actual damages that she incurred due to Defendants' conduct.

First, it is necessary to note that there is no implied covenant of good faith and fair dealing claim separate from a breach of contract claim in Pennsylvania. *Cummings v. Allstate Ins. Co.*, 832 F. Supp. 2d 469, 473–74 (E.D. Pa. 2011); see also *JHE, Inc. v. SEPTA*, 2002 WL 1018941, at *7 (Pa. Com. Pl. May 17, 2002) (stating that a breach of the covenant of good faith is nothing more than a breach of contract claim and that separate causes of action cannot be maintained for each, even in the alternative). Therefore, Travis' claim for a breach of the implied covenant of good faith and fair dealing merges with her breach of contract claim.

The crux of Plaintiff's breach of contract claim is that Milbank and State Auto breached sections F.1 and F.5 of the policy by failing to provide the B, D, and E coverages as promised and instead illegally charged additional premiums for coverage that was already included. (Am. Compl., ¶¶ 1-7, 41-66.) Travis also alleges that by use of the Connect Platform and misrepresentations on the Declaration Pages, Defendants tricked her into purchasing coverage that she otherwise would not have bought had she been given proper disclosures. (*Id.*, ¶¶138-139.) As the context of the instant motion requires me to accept the allegations contained in Plaintiff's Amended Complaint as true, I find Travis has pled sufficient facts in her breach of contract claim to survive a motion to dismiss. Plaintiff has properly alleged that Defendants violated the contractual obligations that were entered into when it sold the Policies to her. Accordingly, Defendants' motion is denied as to Count III of the Amended Complaint.

**C. Unfair Trade Practices and Consumer Protection Law**

***5** Travis' Amended Complaint alleges that Defendants "employed fraud, deception, false promise, misrepresentation and the knowing concealment, suppression or omission of material facts in their sale, marketing, advertisement, and administration of the Dwelling Fire policies sold through the Connect Platform from 2016-2021" in violation of the Pennsylvania Unfair Trade Practices and Consumer Protection Law. (Am. Compl., ¶ 154.) Under Pennsylvania law, plaintiffs who may pursue private actions under section 201–9.2(a) of the UTPCPL are limited to: "Any person who purchases or leases goods or services primarily for personal, family or household purposes." *My Space Preschool and Nursery, Inc. v. Capitol Indem. Corp.*, 2015 WL 1185959, at *5 (E.D. Pa. March 13, 2015). "When an insurance policy is purchased to provide coverage to a business, courts in Pennsylvania have consistently found that plaintiffs lack standing to assert a claim under the UTPCPL." *Id.* (collecting cases). Importantly, the UTPCPL is concerned solely with the purpose of the purchase, not with the actual item purchased. *Valley Forge Towers South Condominium v. Ron-Ike Insulators, Inc.*, 574 A.2d 641, 648 (Pa. Super. 1990).

Defendants argue that Travis does not allege that she purchased the insurance policies in question "primarily for personal, family or household purposes." Rather, Defendants claim that Plaintiff purchased 13 policies for 13 different rental properties owned by her for business or commercial purposes, thereby giving Travis no standing to pursue a claim under the UTPCPL. In response, Travis argues that she personally purchased the Policies to cover residential homes, not businesses and that the named insured listed on each Policy is Travis herself, not a business. (ECF No. 21, p. 22) She claims the "purpose of each purchase was to create insurance coverage for a household," and thus she has standing under the UTPCPL. (*Id.*, p. 21-22.)

A review of the Amended Complaint and its exhibits shows that Travis "is a resident of Bethlehem, Pennsylvania." (Am. Compl. ¶20.) A review of the thirteen Declaration Pages for the relevant Policies shows that they cover thirteen different properties located on Green and Halstead Streets in Allentown, Pennsylvania. (*Id.*, Ex. B.) This would indicate that Travis is not personally residing in any of the insured properties. Accordingly, the success of her UTPCPL claim turns on whether it can be said that she was obtaining the subject insurance policies for a "household," even if she herself was not personally a member of said household[2].

Despite the creativity of Travis' argument that she is insuring a "household," she is clearly engaged in the business of renting these thirteen properties to tenants for income. She does not personally reside in any of the homes, nor does she allege that anyone in her family resides in them. It strains credulity to think that an individual who owns multiple investment properties for which she purchases insurance is the type of "person" that the UTPCPL was intended to protect. Further, courts in Pennsylvania have distinguished between residential purpose and investment purpose when evaluating UTPCPL claims in the past. See *Growall v. Maietta*, 931 A.2d 667, 676 (Pa. Super. 2007) (finding that a plaintiff could not state a claim under the UTPCPL because he purchased a property as an investment with the intent to rent it to tenants in the future, the plaintiff did not purchase the property "primarily for residential purposes"); *Lal v. Ameriquest Mortg. Co.*, 858 A.2d 119, 125 (Pa. Super. 2004) (finding that a plaintiff could not state a claim under UTPCPL because it purchased property for investment reasons, not "personal, family or household" purposes.) Travis owned thirteen different properties on two streets, which is clearly an investment or has an income-generating purpose. Therefore, any insurance she purchased on those properties would also be for investment purposes and would not fall under the UTPCPL. Accordingly, Count IV is dismissed from the Amended Complaint.

**D. Fraud**

***6** Travis also brings a fraud claim against Defendants, alleging that they "made a number of materially misleading statements and/or omissions in the advertising, marketing, sale, and administration of their Dwelling Fire policies," and that Travis "reasonably relied on these misrepresentations and/or omissions to form the mistaken belief that their money was being accepted by Defendants in exchange for authentic insurance coverage." (Am. Compl., ¶¶156-157.) Defendants argue that Travis' fraud claim should be dismissed because it fails to meet the particularity requirement of Federal Rule of Civil Procedure 9(b).

Under Pennsylvania law, the elements of a fraud action are: "(1) a representation; (2) which is material to the transaction at hand; (3) made falsely, with knowledge of its falsity or recklessness as to whether it is true or false; (4) with the intent of misleading

another into relying on it; (5) justifiable reliance on the misrepresentation; and (6) the resulting injury was proximately caused by the reliance." *Estate of Quigley v. East Bay Management, Inc.*, 2014 WL 2765135, at **5-6 (E.D. Pa. June 18, 2014), *citing Freeman v. Pittsburgh Glass Works, LLC*, 709 F.3d 240, 257 (3d Cir. 2013). In addition, a fraud claim must meet what the Third Circuit has described as the "stringent pleading restrictions" of Federal Rule of Civil Procedure 9(b), which include stating with particularity the circumstances constituting fraud or mistake. *Frederico v. Home Depot*, 507 F.3d 188, 200 (3d Cir. 2007). "To satisfy this standard, the plaintiff must plead or allege the date, time and place of the alleged fraud or otherwise inject precision or some measure of substantiation into a fraud allegation." *Id., citing Lum v. Bank of America*, 361 F.3d 217, 224 (3d Cir. 2004).

In the instant matter, the Amended Complaint sets forth the date and content of each alleged fraudulent transaction (¶¶ 86-104), explains why the broker was misled by the Connect Platform (¶¶ 39-47), specifies the alleged lack of pertinent disclosures and affirmative material misrepresentations on the Declarations Pages (¶¶ 48-66), and identifies facts that substantiate Plaintiff's allegations that she bought coverage that she did not want and did not need (¶¶ 67-85). The Amended Complaint also explains the purpose of each misrepresentation and omission within the overall fraud. I find that the Amended Complaint contains sufficient factual allegations to satisfy the pleading requirements of Rule 9(b), and therefore, Defendants' motion is denied as to Count V.

### E. Unjust Enrichment, Money Had and Received, and Constructive Trust

Travis sets forth a claim for unjust enrichment, alleging that "Defendants have been enriched and have received a benefit as a consequence of their collection of illegal and excessive premiums for B, D & E coverage through the Connect Platform, and as a consequence of their receipt, retention and failure to pay back the amounts by which they have been overpaid." (Am. Compl., ¶¶ 162, 163-171.)

The doctrine of unjust enrichment is "inapplicable when the relationship between parties is founded on a written agreement or express contract." *Conquest v. WMC Mortgage Corp.*, 247 F.Supp.3d 618, 643 (E.D. Pa. Mar. 30, 2017) (internal citations and quotations omitted); see also *Benner v. Bank of America, NA*, 917 F.Supp.2d 338, 360 (E.D. Pa. Jan. 7, 2013). Plaintiff's claim for unjust enrichment fails because her claims are based on written contracts, specifically the insurance policies in question. While it is true that a party is not precluded from pleading both theories as alternative avenues for relief, *Patel v. Patel*, 2018 WL 3642417, at *6 (E.D. Pa. Aug. 1, 2018) (internal citations omitted), recovery under a theory of unjust enrichment is only allowed "**where an express contract cannot be proven.**" *Id.* (emphasis included in original, internal citations and quotation marks omitted). Travis however, has not pled any facts questioning the validity and/or applicability of the Policies in question, nor does her Amended Complaint request rescission of the Policies. Accordingly, I will grant Defendants' motion to dismiss the unjust enrichment claim, as the parties' relationship in this matter is clearly founded upon written agreements.

***7** Under Pennsylvania law, "[a] cause of action for money had and received is a claim by which the plaintiff seeks to recover money paid to the defendant by mistake or under compulsion, or where the consideration was insufficient." *Patel*, 2018 WL 3642417, at *8. In this matter, Travis claims that Defendants have in their possession money that has been wrongfully diverted from its proper use because of the scheme alleged in the Amended Complaint, and which belongs to and ought to be paid to Plaintiff. (Am. Compl., ¶¶ 172-182.)

Much like her unjust enrichment claim, Travis' claim for money had and received is precluded by the existence of the Policies. *Patel*, 2018 WL 364217 at *8 (stating that Pennsylvania "recognizes some claims for money had and received where the money was paid pursuant to an express contract and that contract is found to be void.") As Travis has failed to dispute the validity of the Policies, this claim is barred and I will grant Defendants' motion to dismiss Count VII of the Amended Complaint.

Lastly, under Pennsylvania law, " '[a] constructive trust arises where a person who holds title to property is subject to an equitable duty to convey it to another on the ground that he would be unjustly enriched if he were permitted to retain it.' " *Conquest v. WMC Mortgage Corp.*, 247 F. Supp. 3d at 644, quoting *Pierro v. Pierro*, 264 A.2d 692, 696 (Pa. 1970). "[A] constructive trust works in tandem with unjust enrichment, and for a constructive trust to be plausible, the elements of unjust enrichment must be adequately pled." *Id.* (internal citations omitted). Since Travis does not state a claim for unjust enrichment, Count VIII requesting the imposition of a constructive trust on Defendants must also fail.

**V. CONCLUSION**

For the foregoing reasons, Defendants' Motion to Dismiss is granted in part and denied in part. Defendants' motion is granted as to Counts I, II, IV, VI, VII and VIII and said counts are dismissed from the Amended Complaint with prejudice. Defendants' motion is denied as to Counts III and V of the Amended Complaint.

**All Citations**

Not Reported in Fed. Supp., 2023 WL 2163975

Footnotes

1 Defendants also argue that Travis' RICO claims must fail because she fails to allege a predicate act, an injury to a business or person and/or proximate cause. As I find Plaintiff's RICO claims must fail due to her inability to allege the conduct of an enterprise, I do not reach Defendants' additional arguments.

2 The UTPCPL itself fails to define "household." Further, I have located no caselaw in which a Pennsylvania court has defined "household" in reference to the UTPCPL.

**End of Document** © 2026 Thomson Reuters. No claim to original U.S. Government Works.